# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

RICHARD L. BYRD,

          Plaintiff,

     v.

THE GWINNETT COUNTY SCHOOL
DISTRICT,

          Defendant.

CIVIL ACTION NO.

1:22-cv-01457-SDG-RGV

## MAGISTRATE JUDGE'S FINAL
## REPORT, RECOMMENDATION, AND ORDER

Plaintiff Richard L. Byrd ("Byrd") brings this action against defendant
Gwinnett County School District ("GCSD"), alleging claims of race and color
discrimination and retaliation in violation of Title VII of the Civil Rights Act of
1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq., as well as a race
discrimination claim under 42 U.S.C. § 1981 ("§ 1981"). [Doc. 15].[1]  Byrd also
asserts a state law claim against GCSD for violations of the Georgia Whistleblower
Act ("GWA").  See [id.].  GCSD moves for summary judgment on Byrd's claims,
[Doc. 49], which Byrd opposes, [Doc. 52], and GCSD has filed a reply in support

---

[1] The listed document and page numbers in citations to the record refer to the
document and page numbers shown on the Adobe file reader linked to the Court's
electronic filing database, CM/ECF, except that citations to deposition transcripts
will also be cited according to the transcript page numbers.  However, Byrd's
deposition transcript, [Doc. 44 (Pl.'s Dep.)], will be cited according to the CM/ECF
page numbers because those are the only page numbers for the transcript.

of its motion for summary judgment, [Doc. 56]. Byrd also has filed a motion for leave to file a surreply, [Doc. 58], which GCSD opposes, [Doc. 59], and Byrd filed a reply in support of his motion for leave to file a surreply, [Doc. 60]. For the reasons that follow, Byrd's motion for leave to file a surreply, [Doc. 58], is **GRANTED**, and it is **RECOMMENDED** that GCSD's motion for summary judgment, [Doc. 49], be **GRANTED**.

## I.    FACTUAL BACKGROUND

### A.    <u>Preliminary Procedural Issues & Compliance with Local Rules Governing Summary Judgment</u>

"In this District, the process for separating disputed from undisputed material facts is governed by Local Rule 56.1(B)." <u>Brandon v. Lockheed Martin Aeronautical Sys.</u>, 393 F. Supp. 2d 1341, 1347 (N.D. Ga. 2005), adopted at 1345; <u>see also</u> <u>Dobson v. Fulton Cnty.</u>, CIVIL CASE NO. 1:19-cv-00902-ELR-RGV, 2020 WL 5549246, at *2 (N.D. Ga. July 9, 2020) (citation omitted), adopted by 2020 WL 5548771, at *7 (N.D. Ga. Aug. 31, 2020).  In compliance with Local Rule 56.1(B)(1), GCSD, as movant, filed a statement of undisputed material facts, [Doc. 49-2], and Byrd has responded, [Doc. 54].  Byrd also filed a statement of undisputed material facts, [Doc. 53], to which GCSD has responded, [Doc. 57].[2]

---

[2] The Local Rules contemplate the movant for summary judgment filing a "motion and brief" and "a separate, concise, numbered statement of the material facts to which there is no genuine issue to be tried," and requires the nonmovant to respond to that statement while also permitting the nonmovant to "file a separate

Before addressing the merits of Byrd's claims, the Court must first determine whether it may properly consider certain evidence and statements of fact offered by Byrd in relation to his claims.  In its reply brief in support of its summary judgment motion, [Doc. 56], GCSD objects to Byrd's submission of "a transcript based upon a recording neither of which were produced during the discovery period," [id. at 15 (citing [Doc. 52-10])].  GCSD also "objects to the admissibility of the transcript," pointing out that Byrd has "failed to produce the original recording" and that the transcript, which is "unauthenticated," "lacks sufficient support to establish that the document is an accurate depiction of what it claims to be."  [Id. at 16 (citation omitted)].  GCSD asserts that while Byrd "signed a declaration 'certifying' the transcript, he did not transcribe the recording himself nor does he have any personal knowledge of the processes that were used

---

statement of additional facts which the nonmovant contends are material and present a genuine issue for trial." Circle Grp., L.L.C. v. Se. Carpenters Reg'l Council, 836 F. Supp. 2d 1327, 1349 (N.D. Ga. 2011) (citing LR 56.1(B), NDGa.). While GCSD properly filed its statement of undisputed material facts, [Doc. 49-2], as contemplated by the Local Rules, Byrd's statement of undisputed material facts, [Doc. 53], "does not comply with [the Local Rules] since, as []he asserts, these facts are undisputed and therefore do not create any genuine issues for trial," Phillips v. City of Atlanta, CIVIL CASE NO. 1:14-cv-00680-TWT-RGV, 2016 WL 5429666, at *1 n.4 (N.D. Ga. July 29, 2016), adopted by 2016 WL 5394089, at *1 (N.D. Ga. Sept. 27, 2016); see also Dibauda v. Thaxton Inv. Corp., CIVIL CASE NO. 3:18-cv-00102-TCB-RGV, 2019 WL 8376269, at *2 n.4 (N.D. Ga. Dec. 5, 2019) (citation omitted), adopted by 2020 WL 1800117, at *3 (N.D. Ga. Jan. 27, 2020). "Nevertheless, the Court will consider the parties' statements of fact and review the evidentiary material to ensure that the undisputed facts are supported by the record." Phillips, 2016 WL 5429666, at *1 n.4.

by the third-party website in the transcription of the recording." [Id.]. GCSD further argues that the "transcript is inadmissible hearsay within hearsay that is without an exception," and for all of these reasons, the Court "should decline to consider this improperly produced evidence and any factual statement which relies upon [ it] should not be considered[.]" [Id. at 17 (citations omitted)]; see also [Doc. 57 ¶¶ 47, 48, 49, 61, 74, 75. Finally, GCSD argues that certain paragraphs of Byrd's "affidavit contradict[] his sworn deposition testimony and his discovery responses" and "is an obvious and transparent sham and should be disregarded by this Court." [Doc. 56 at 19]; see also [Doc. 52-2 (Pl.'s Decl.) ¶¶ 13, 15, 28a.; Doc. 57 ¶¶ 18, 20, 37].

Byrd has filed a motion for leave to file a surreply brief in order to address GCSD's arguments with respect to the exclusion of certain evidence he submitted in support of his opposition to GCSD's motion for summary judgment, [Doc. 58], which GCSD opposes, [Doc. 59], and Byrd has filed a reply in support of his motion. [Doc. 60]. "Neither the Federal Rules of Civil Procedure nor this Court's Local Rules authorize the filing of surreplies." Atlanta Fiberglass USA, LLC v. KPI, Co., 911 F. Supp. 2d 1247, 1262 (N.D. Ga. 2012) (citation and internal marks omitted); see also Leatherwood v. Anna's Linens Co., 384 F. App'x 853, 857 (11th Cir. 2010) (per curiam) (unpublished) (citation omitted). "Although the Court may in its discretion permit the filing of a surreply, this discretion should be exercised

in favor of allowing a surreply only where a valid reason for such additional briefing exists, such as where the movant raises new arguments in its reply brief." Fedrick v. Mercedes-Benz USA, LLC, 366 F. Supp. 2d 1190, 1997 (N.D. Ga. 2005) (citations omitted); see also St. James Ent. LLC v. Dash Crofts, Civil Action No. 1:09-CV-1975-RWS, 2010 WL 2802616, at *1 (N.D. Ga. July 13, 2010) ("Certainly, the Court is disinclined to consider arguments raised in a surreply which could have been raised in an earlier filing."). Otherwise, "[t]o allow such surreplies as a regular practice would put the court in the position of refereeing an endless volley of briefs." Atlanta Fiberglass USA, LLC, 911 F. Supp. 2d at 1262 (citation and internal marks omitted). Because GCSD raised new arguments concerning the admissibility of certain evidence offered by Byrd in its reply brief, see [Doc. 56 at 15-19], Byrd has shown good cause for filing a surreply, and the Court will consider Byrd's surreply, [Doc. 58-1]. Accordingly, Byrd's motion for leave to file a surreply, [Doc. 58], is **GRANTED**, and the Clerk is **DIRECTED** to enter Byrd's surreply, [Doc. 58-1], on the docket.

GCSD first objects to the admission of a transcript that is based upon an audio recording by Byrd during a meeting that occurred on July 12, 2021, arguing that since Byrd "did not disclose or produce the audio recording or the transcript of the audio recording until submission of his [r]eply [b]rief in opposition to [GCSD's m]otion for [s]ummary [j]udgment," and he "did not produce the audio

5

recording of the meeting until May 5, 2023," after GCSD filed its reply brief in support of its summary judgment motion on May 3, 2023, the "information should be excluded by the [C]ourt," pursuant to Rule 37(c) of the Federal Rules of Civil Procedure [Doc. 59 at 5 (footnote omitted)], which states:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.[3]

Fed. R. Civ. P. 37(c)(1).  Rule 26(a)(1)(A) provides, in pertinent part:

> Except as exempted by Rule 26(a)(1)(B) or as otherwise stipulated or ordered by the court, a party must, without awaiting a discovery request, provide to the other parties:
>
>> (ii) a copy--or a description by category and location--of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment[.]

Fed. R. Civ. P. 26(a)(1)(A)(ii).  Additionally, Rule 26(e) provides, in relevant part:

> A party who has made a disclosure under Rule 26(a)--or who has responded to an interrogatory, request for production, or request for admission--must supplement or correct its disclosure or response . . .

---

[3] "A substantial justification exists if there is justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request," and the "failure to disclose is harmless when there is no prejudice to the party entitled to receive the disclosure." Hammonds v. Jackson, CIVIL ACTION FILE NO. 1:13-CV-711-MHS-WEJ, 2015 WL 12867065, at *3 (N.D. Ga. Mar. 16, 2015) (citations and internal marks omitted), adopted by 2015 WL 12866453, at *7 (N.D. Ga. May 18, 2015), aff'd sub nom. Hammonds v. Fulton Cnty., 628 F. App'x 716 (11th Cir. 2016) (per curiam) (unpublished).

> in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing[.]

Fed. R. Civ. P. 26(e)(1)(A).  A party's Rule 26(a) initial and supplemental disclosure duties therefore include supplementing discovery responses in a timely manner when the party with the duty to disclose learns that its previous document production was incomplete or when ordered by the Court to supplement or correct its responses, and the "[f]ailure to do either can result in sanctions under Rule 37(c)(1)."  In re Delta/AirTran Baggage Fee Antitrust Litig., 846 F. Supp. 2d 1335, 1355 (N.D. Ga. 2012), modified by 2012 WL 12952328 (N.D. Ga. July 18, 2012).

GCSD asserts that Byrd never produced the audio recording or the transcript prior to the close of discovery, even though it requested the production of any "recordings between [Byrd] and any current or former employee of the [GCSD] from January 1, 2021 to present and any recordings and/or any other tangible material documenting any event or circumstances related to [Byrd's] employment with [ GCSD] from January 1, 2021, in paragraphs 13 and 14 of [ GCSD's r]equests for [p]roduction," yet, "neither the recording, nor the transcript were produced prior to [Byrd's] submission of his [r]eply brief."  [Doc. 59 at 8

(alteration and internal marks omitted)].[4]  In response, Byrd explains that "[u]pon receipt of [ GCSD's r]eply [b]rief, and after reviewing [his] discovery submitted exhibits and determining that the July 12, 2021, audio recording was not submitted as a discovery exhibit, but instead that the exhibit which [his] counsel submitted as Exhibit 12 was a duplicative recording of another [ d]iscovery exhibit . . ., [his] counsel produced such audio recording to [ GCSD's] counsel on May 5, 202[3]."[5] [Doc. 58-1 at 4].  Byrd therefore maintains that the July 12, 2021, audio recording "was inadvertently omitted from his counsel's submission of several audio tape files to [ GCSD's] counsel via internet Dropbox transmission."  [Id. at 5].  Byrd also maintains that the "failure to provide to [ GCSD] a copy of the July 12, 2021 audio recording in this instance was harmless" since he "testified about the existence of the July 12, 2021 audio recording in his deposition taken by counsel for [ GCSD], and [he] testified regarding the critical statements made . . . and heard by him in

---

[4] The Court notes that while Byrd submitted a transcript of the audio recording, as well as his own declaration in an attempt to authenticate the audio recording at issue, see [Doc. 52-10 (Pl.'s Decl.) at 2-3]; see also [id. at 4-29], he has not submitted the audio recording itself, and "transcripts are not the best evidence of the recorded conversation; in this instance, the recording[ itself is] the best evidence," Mimbs v. Spalding Cnty. Sch. Dist., CIVIL CASE NO. 3:17-cv-00032-TCB-RGV, 2018 WL 7348863, at *3 n.6 (N.D. Ga. Dec. 21, 2018) (citation and internal marks omitted).

[5] Given the chronology of events, the Court presumes that Byrd's reference to May 5, 2021, was simply a typographical error and that he was actually referring to May 5, 2023.

the July 12, 2021 meeting in such deposition[.]"  [Id. at 5-6 (citation omitted)].  Byrd further maintains that GCSD "already had possession of its own recording of the July 12, 2021 meeting, and [that GCSD] was aware of what was stated in such meeting," and that the Court "should not require [ Byrd] to submit an audio recording to [ GCSD] which is cumulative and/or duplicative of evidence which [ GCSD] has stated it has in its possession, and which was testified about in . . . depositions."  [Id. at 7-8].  Alternatively, Byrd contends that his actions were substantially justified, and the Court "is not required to exclude the audio recording of the July 12, 2021 meeting."  [Id. at 9-12 (citation omitted)].

In response, the GCSD admits that it had in its possession "an approximately [13] minute recording," which it maintains "is significantly shorter than [Byrd's 45] minute audio recording," and therefore, "due to the dissimilarities between the two recordings, production of both the recording and the transcript was clearly not cumulative or duplicative and was required under the Federal Rules of Civil Procedure."  [Doc. 59 at 6-7].  GCSD also contends that "even if [Byrd's] mistake was honest, it was careless to [the] point of obstructing [GCSD's] access to the existence of this information," as "the mistake [was] obvious and should have been noticeable and easy to remedy had [Byrd] or his counsel carefully reviewed Exhibits 12 and 13 before producing both in discovery."  [Id. at 7-8].  GCSD further contends that it "was unduly prejudiced in having to respond

to the undisclosed material at this stage of the litigation," and it was "unfairly surprised and unable to pursue other potential avenues for seeking the undisclosed information[.]"  [Id. at 9].  Finally, GCSD contends that Byrd has failed to show substantial justification for his failure to disclose the recording or transcript of the July 12, 2021, meeting during discovery.  [Id. at 9-11].

"District courts have broad discretion to determine whether a violation of Rule 26(a)(2) is harmless."  Brantley v. Ferrell Elec., Inc., 112 F. Supp. 3d 1348, 1358 (S.D. Ga. 2015) (citation omitted).   In deciding whether a failure to disclose is harmless under Rule 37(c), courts consider (1) the importance of the evidence, (2) the reasons for the failure to disclose, and (3) the prejudice to the opposing party if the evidence is considered.  Cooley v. Great S. Wood Preserving, 138 F. App'x 149, 161 (11th Cir. 2005) (per curiam) (unpublished) (citation omitted).[6]  "Other

---

[6] Several courts within the Eleventh Circuit have also listed surprise to the opposing party as a factor to consider.  See Vitola v. Paramount Automated Food Servs., Inc., No. 08-61849-CIV, 2009 WL 5067658, at *1 (S.D. Fla. Dec. 17, 2009) (citation omitted) ("The following factors should guide the court in determining whether to exclude evidence pursuant to Rule 37(c)(1): '(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date.'"); United States ex rel. Bane v. Breathe Easy Pulmonary Servs., Inc., No. 8:06-cv-40-T-33MAP, 2009 WL 92826, at *3 (M.D. Fla. Jan. 14, 2009) (citation and internal marks omitted) ("The district court has broad discretion in deciding whether a failure to disclose evidence is substantially justified or harmless under Rule 37(c)(1), and it is suggested that the court be guided by the following factors: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the

relevant considerations include whether the concealing party acted in bad faith, whether the party seeking exclusion of undisclosed evidence suffered prejudice, and whether the prejudice, if any, can be cured." Blackledge v. Ala. Dep't of Mental Health & Mental Retardation, Civil Action No. 2:06cv321-ID, 2007 WL 3124452, at *12 (M.D. Ala. Oct. 25, 2007) (footnote omitted). "Even if substantial justification is lacking, no sanction should be imposed if no harm has occurred to [GCSD]." Two Men & a Truck Int'l, Inc., 2008 WL 5235115, at *2.

Having considered the parties' arguments, the Court finds that "under the circumstances of this case, . . . [Byrd's] delay in providing [the audio recording and transcript] was harmless," and GCSD has not "shown any real prejudice resulting from [the] . . . delay[.]" Andrade v. Merson, Case No. 21-CV-60563-SMITH/VALLE, 2021 WL 7451931, at *3 (S.D. Fla. Dec. 3, 2021). Indeed, Rule 26 provides that a "party who has made a disclosure under Rule 26(a)--or who has responded to an interrogatory, request for production, or request for admission-- must supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and *if the additional or corrective information has not otherwise been made*

---

evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence."); Two Men & a Truck Int'l, Inc. v. Residential & Com. Transp. Co., No. 4:08cv67-WS/WCS, 2008 WL 5235115, at *2 (N.D. Fla. Oct. 20, 2008) (citation omitted) (same), adopted by 2008 WL 11340311, at *1 (N.D. Fla. Dec. 15, 2008).

*known to the other parties during the discovery process or in writing*[.]"  Fed. R. Civ. P. 26(e)(1)(A) (emphasis added).  GCSD clearly was aware of the July 12, 2021, audio recording as it admits that it had in its own possession a 13-minute version of the recording, and Byrd testified as to the salient points of the recording in his deposition, as well as the fact that GCSD's witness also testified about the meeting. See [Doc. 59 at 7]; see also [Doc. 44 at 135-36, 138, 155-56, 216, 218-19; Doc. 47 (Batiste Dep.) at 140-43 pp. 139-42].  Thus, "the surprise to [GCSD] is marginal," and "[m]oreover, the importance of the evidence is minimal," and Byrd's "non-compliance with Rule 26(a) and (e) caused no discernible harm to [GCSD] and therefore does not warrant exclusion[.]"  Brantley, 112 F. Supp. 3d at 1358. Furthermore, "there is no allegation or evidence whatsoever of willful noncompliance or bad faith on the part of [Byrd] that would warrant exclusion either."  Id. at 1358-59 (citations omitted); see also Pitts v. HP Pelzer Auto. Sys., Inc., 331 F.R.D. 688, 697 (S.D. Ga. 2019) (finding "the harsh sanction of exclusion" was not warranted where there was "no willfulness or bad faith" on the non-disclosing party's part and that the explanation "further weigh[ed] against exclusion," especially since "there [was no evidence that [d]efendant withheld the evidence for a surprise attack").  "Because the court decides that the late disclosure was harmless, [] the court need not determine whether it was substantially justified," Gilley v. C.H. Robinson Worldwide, Inc., CIVIL ACTION NO. 1:18-

00536, 2021 WL 2785333, at *4 (S.D.W. Va. July 2, 2021), and thus, exclusion of the transcript of the audio recording is not warranted under the circumstances of this case pursuant to Rule 37(c)(1) of the Federal Rules of Civil Procedure.

GCSD also objects to the admissibility of the transcript, arguing that the "transcript alone lacks sufficient support to establish that the document is an accurate depiction of what it claims to be." [Doc. 56 at 16]. GCSD also argues that the transcript is inadmissible as unauthenticated, asserting that even though Byrd "signed a declaration 'certifying' the transcript, he did not transcribe the recording himself nor does he have any personal knowledge of the processes that were used by the third-party website in the transcription of the recording," and that "there is no certification by a custodian or another qualified individual from the transcriber attesting to the accuracy of the transcript." [Id. (citation omitted)]. For the reasons that follow, the Court finds GCSD's arguments unpersuasive.

"Evidence is properly authenticated when there is evidence sufficient to support a finding that the matter in question is what its proponent claims." Johnson v. Int'l Bus. Machs. Corp., CIVIL ACTION FILE NO. 1:16-CV-04462-MHC-LTW, 2019 WL 13269755, at *6 (N.D. Ga. July 23, 2019) (citations and internal marks omitted). Rule 901 of the Federal Rules of Evidence "only requires presentation of sufficient evidence to make out a prima facie case that the proffered evidence is what it purports to be and circumstantial evidence alone may

be enough." Id. (citations omitted).  "Transcripts of audio recordings may be authenticated by a party to the conversations," and here, Byrd authenticates the transcript "upon which he relies," id. (citations omitted), by stating that the "transcript of the audio recording which is attached and initialed on each page by me, along with the corrections of such transcript[,] . . . together contain an accurate reflection of the meeting which took place on July 12, 2021," between the two individuals and Byrd as depicted in the transcript, [Doc. 52-10 at 2-3 ¶¶ 2-3]. Despite GCSD's arguments, Byrd "was a party to the conversation and recorded the conversation himself," and thus, he "would be in a position to . . . verify that the transcript accurately reflects who said what," and he "has done so here because he states that the transcript [] represent[s] the conversation[] he had and that the transcript[ is a] true depiction[] of the conversation." Johnson, 2019 WL 13269755, at *6.  Therefore, the Court rejects GCSD's arguments in this regard, and it will consider the transcript, to the extent necessary, in ruling on GCSD's summary judgment motion.

GCSD also generally objects to Byrd's declaration at [Doc. 52-2], as a "lengthy affidavit containing hearsay, conclusory statements without factual support, and other inadmissible information," that also "constitutes a sham," [Doc. 56 at 17-18 (citation omitted)]; see also [Doc. 57 ¶¶ 18, 20, 37; Doc. 59 at 13-14].  As Byrd points out, however, while GCSD "refers to alleged contradictions in

14

[ his] testimony," GCSD has not presented any specific allegations upon which his declaration should be excluded nor has Byrd "contradicted his statements in his deposition testimony[.]"   [Doc. 58-1 at 12 (internal citation omitted)].   The Court agrees with Byrd.

"An affidavit may be considered a 'sham' affidavit 'when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact . . . [and that party attempts] thereafter [to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.'"   White v. Crystal Mover Servs., Inc., Civil Action No. 1:13–CV–1452–WSD–JSA, 2014 WL 4662371, at *19 (N.D. Ga. June 24, 2014) (alterations in original) (citation omitted) (quoting Tippens v. Celotex Corp., 805 F.2d 949, 954 (11th Cir. 1986)), adopted as modified by 2014 WL 4662379, at *10 (N.D. Ga. Sept. 18, 2014), aff'd, 615 F. App'x 545 (11th Cir. 2015) (per curiam) (unpublished).   The Eleventh Circuit has cautioned that the sham affidavit rule "should be used sparingly, and the affidavit and deposition must contain inherent inconsistencies before the affidavit can be disregarded."   Wolk v. Seminole Cnty., 276 F. App'x 898, 900 (11th Cir. 2008) (per curiam) (unpublished) (citation omitted).   "A court presented with such an inconsistency in a party's testimony may disregard the later 'sham affidavit' in favor of the earlier deposition testimony."   White, 2014 WL 4662371, at *19 (citations omitted) (citing Van T.

15

Junkins & Assocs. v. U.S. Indus., Inc., 736 F.2d 656, 658 (11th Cir. 1984)).  However, a "court must be careful to distinguish between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence."  nVision Global Tech. Sols., Inc. v. Cardinal Health 5, LLC, 887 F. Supp. 2d 1240, 1260 (N.D. Ga. 2012) (citation and internal marks omitted).

"In considering a motion for summary judgment, a district court must consider all the evidence before it and cannot disregard a party's affidavit merely because it conflicts to some degree with an earlier deposition."  Kennett-Murray Corp. v. Bone, 622 F.2d 887, 893 (5th Cir. 1980) (citations omitted).[7]  Indeed, "[e]very discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence," and "[i]n light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an early deposition."  Tippens, 805 F.2d at 954 (footnote and citations omitted).  The Court has reviewed the testimony in question and GCSD's objections, see [Doc. 57 ¶¶ 18, 20, 37]; see also [Doc. 52-2 ¶¶ 13, 15, 28a.], and finds that Byrd's declaration is not internally inconsistent and does not directly contradict his deposition testimony, see Phillips

---

[7] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent in the Eleventh Circuit.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

v. Tacala, LLC, 883 F. Supp. 2d 1138, 1145 (N.D. Ala. 2012) (finding deposition and declaration testimony were not inconsistent).   Therefore, the Court overrules GCSD's objections to the challenged portion of Byrd's declaration on this basis.[8]

---

[8] GCSD also objects that certain statements of additional material facts set forth by Byrd are based upon evidence that constitutes inadmissible hearsay.  See [Doc. 57 ¶¶ 10-12, 19, 39, 41, 50, 56-57, 62, 69].  "[W]hen considering a motion for summary judgment, [t]he general rule is that inadmissible hearsay cannot be considered," but "there is an exception to the general rule: a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." Coffman v. Battle, 786 F. App'x 926, 934 (11th Cir. 2019) (per curiam) (unpublished) (second alteration in original) (internal marks omitted) (quoting Macuba v. Deboer, 193 F.3d 1316, 1322-23 (11th Cir. 1999)); see also Johnson v. Fulton Cnty. Bd. of Tax Assessors, Civil Action File No. 1:18-cv-5292-TWT-JKL, 2021 WL 2582304, at *13 n.31 (N.D. Ga. Jan. 28, 2021) (citation omitted), adopted sub nom. Johnson v. Fulton Cnty., CIVIL ACTION FILE NO. 1:18-CV-5292-TWT, 2021 WL 2581431, at *1 (N.D. Ga. Feb. 17, 2021).  The Court will further address the admissibility of the challenged statements and the evidence upon which they rely, to the extent they are material, in connection with discussing the merits of GCSD's motion for summary judgment hereinafter.  Furthermore, GCSD objects to the consideration of a sworn statement by Karla Johnson ("Johnson"), [Doc. 52-4 (Johnson Sworn Stmt.)], as "an unauthenticated and un-notarized affidavit," however, despite Johnson's statement being labeled as "sworn," [id. (emphasis and all caps omitted), it appears that it was provided pursuant to 28 U.S.C. § 1746 for unsworn declarations, which provides that "a declaration submitted 'under the penalty of perjury and [signed and] dated' is admissible in lieu of a sworn affidavit," Nu Image, Inc. v. Does 1-3, 932, No. 2:11–cv–545–FtM–29SPC, 2012 WL 1890854, at *5 (M.D. Fla. May 10, 2012) (quoting 28 U.S.C. § 1746), adopted by 2012 WL 1890829, at *3 (M.D. Fla. May 24, 2012); see also Thro v. Bagwell, No. 5:08cv120/RS/EMT, 2011 WL 3925040, at *1 n.4 (N.D. Fla. Aug. 9, 2011) (citing 28 U.S.C. § 1746) (explaining that "[§ 1746] provides an alternative to making a sworn statement," under which the statement must include a signed and dated "averment[] . . . that the statement is true under penalty of perjury"), adopted by 2011 WL 3925031, at *1 (N.D. Fla. Sept. 7, 2011).  The declaration at issue is signed and dated by Johnson and was made under penalty of perjury, see [Doc. 52-4], and

Given these rulings, the Court accepts as undisputed those facts which the parties admit or have failed to properly dispute or deny.  <u>See</u> [Doc. 54, admitting or failing to properly dispute or deny ¶¶ 1-32, 34-75, 77-78, 80-84, and parts of ¶¶ 33 and 76 of GCSD's statement, Doc. 49-2; Doc. 57, admitting or failing to properly dispute or deny ¶¶ 1-3, 5, 10-11, 13-14, 17, 19, 21-22, 25-26, 31, 33, 41-42, 45, 49, 68-70, 78-79, and parts of ¶¶ 4, 6-7, 15-16, 18, 20, 24, 27-30, 34, 36-40, 43, 46-48, 50, 53-58, 61, 64-65, 67, 71-77, and 81-83 of Byrd's statement, Doc. 53].[9]  Nevertheless, as required on a motion for summary judgment, the Court construes the following pertinent facts in the light most favorable to Byrd as the non-moving party.  <u>Cotton v. Enmarket Inc</u>, 809 F. App'x 723, 724 (11th Cir. 2020) (per curiam) (unpublished) (citation omitted); <u>see also</u> <u>Whitehead v. BBVA Compass Bank</u>, 979 F.3d 1327, 1328

---

thus, the statement is an acceptable alternative under the statute, <u>see</u> 28 U.S.C. § 1746.

[9] The Court also has omitted certain facts which are not material to the issues presented in the pending motion for summary judgment, were stated as an issue or legal conclusion, or were not supported by citations to evidence or were supported by citations to evidence that did not actually support the fact.  <u>See</u> LR 56.1(B)(1), (2)(a)(2), NDGa.; <u>see also Aim Recycling of Fla., LLC v. Metals USA, Inc.</u>, Case No. 18-cv-60292-BLOOM/Valle, 2020 WL 209860, at *6 (S.D. Fla. Jan. 13, 2020) (citations omitted) (explaining that the Court "must still be satisfied that the evidence in the record supports the [] material facts proposed").

(11th Cir. 2020) (citations omitted); <u>Rose v. Wal-Mart Stores E., Inc.</u>, 631 F. App'x 796, 798 (11th Cir. 2015) (per curiam) (unpublished) (citation omitted).[10]

## B.   **Statement of Facts and Procedural History**

GCSD, a political subdivision of the state of Georgia, operates the public elementary, middle, and high schools in Gwinnett County, with the exception of those located within the territorial boundaries of the city of Buford, Georgia.  [Doc. 47-1 at 8, 47]; <u>see also</u> [Doc. 49-1 at 2; Doc. 49-2 ¶ 1 (citation omitted); Doc. 54 ¶ 1].

---

[10] "In determining whether evidence creates a factual dispute, [the Court] draw[s] reasonable inferences in favor of the nonmoving party, but inferences based upon speculation are not reasonable." <u>Byrd v. UPS</u>, 814 F. App'x 536, 537 (11th Cir. 2020) (per curiam) (unpublished) (citation omitted).  Additionally, "[t]he substantive law will identify which facts are material, and material facts are those which are key to establishing a legal element of the substantive claim which might affect the outcome of the case." <u>Campbell v. Shinseki</u>, 546 F. App'x 874, 877 (11th Cir. 2013) (per curiam) (unpublished) (citation and internal marks omitted); <u>see also</u> <u>Varnedoe v. Brennan</u>, CV418-067, 2021 WL 1115300, at *3 (S.D. Ga. Mar. 2, 2021) (citations omitted), adopted by 2021 WL 1112700, at *1 (S.D. Ga. Mar. 23, 2021), <u>aff'd sub nom.</u> <u>Varnedoe v. Postmaster Gen.</u>, No. 21-11186, 2022 WL 35614 (11th Cir. Jan. 4, 2022) (per curiam).  Accordingly, what follows is a summary of facts as presented by GCSD in its statement of undisputed material facts, <u>see</u> [Doc. 49-2], and the Court will note those occasions in which Byrd offers additional or conflicting factual statements that are supported by the evidence of record, <u>J.D.P. v. Cherokee Cnty., Ga. Sch. Dist.</u>, 735 F. Supp. 2d 1348, 1350 (N.D. Ga. 2010).  The Court has also taken additional facts from the exhibits to the motion for summary judgment and responses in order to fully describe Byrd's allegations.  <u>See</u> <u>Tishcon Corp. v. Soundview Commc'ns, Inc.</u>, Civil Action No. 1:04-CV-524-JEC, 2005 WL 6038743, at *3 (N.D. Ga. Feb. 15, 2005) (citing Fed. R. Civ. P. 56(c)) ("When ruling on summary judgment, the Court may consider pleadings, depositions, answers to interrogatories, admissions on file, and affidavits submitted by the parties."); Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

The Gwinnett County Board of Education (the "Board") sets policies that govern the operations of GCSD, see [Doc. 44-5]; see also [Doc. 49-2 ¶ 2 (citation omitted); Doc. 54 ¶ 2], and the Division of Human Resources and Talent Management ("HR") oversees the employment needs of GCSD, including internal resolution and compliance, leadership development, HR assistance, and HR systems, [Doc. 47 at 15-16 pp. 14-15].[11]   During all times relevant to this case, Associate Superintendent and Chief HR Officer Dr. Monica Batiste ("Batiste") operated the HR division.  [Id. at 12-13 pp. 11-12].

Byrd, an African American male, began his employment with GCSD as the Instructional Support Center ("ISC") Facility Manager in January 2006.  [Doc. 44 at 18, 26; Doc. 52-2 ¶¶ 1-3].   As the ISC Facility Manager,   Byrd's job duties

---

[11] The Department of Internal Resolution and Compliance within the HR division is responsible for communicating, monitoring, and enforcing Board policies and procedures that prohibit any form of discrimination based on race, color, religion, sex, age, national origin, or disability, as well as inappropriate or offensive conduct, and investigating and resolving any claims of discrimination or retaliation and overseeing processes for accommodation requests based on disability or religious need.  [Doc. 46 (Gomez Dep.) at 158-59 pp. 157-58, 198 p. 197, 200-01 pp. 199-200; Doc. 47 at 43-44 pp. 42-43; Doc. 47-1 at 29].  GCSD policy GAAA prohibits impermissible discrimination, including discrimination on the basis of sex, race, color, or disability, [Doc. 44 at 41; Doc. 44-6], and GCSD policy GAE provides the procedure for employee complaints and grievances, [Doc. 44 at 30-31; Docs. 44-4 & 44-5].  All GCSD policies and procedures are available online for employees to view, [Doc. 44 at 30; Doc. 44-4], and, for GCSD employees charged with conducting employee performance evaluations, resources and training materials are available in the Documenting Employee Performance guide, [Doc. 47 at 210-12 pp. 209-11; Doc. 47-19].

included overseeing the physical workings of the ISC facility, which also consisted of supervising the security department, mailroom department, maintenance, and the custodial department.  [Doc. 44 at 18, 20, 49-50].  During Byrd's employment with GCSD, his supervisor was Jorge Gomez ("Gomez"), the Executive Director for Administration and Policy, and Byrd also had an Administrative Assistant, Karoline Beard ("Beard").  [Id. at 25, 49-50; Doc. 52-2 ¶ 5].[12]

On March 16, 2021, Byrd instructed Beard to ask Security Monitor David Larkins ("Larkins") to go to Publix grocery store to purchase a glue stick and some ribbon in relation to a retirement gift for an employee of the ISC Facilities department.  [Doc. 44 at 56-58; Doc. 44-9; Doc. 44-14].[13]  Larkins believed that this request was along the lines of a personal errand and outside the scope of his job duties and explained that to Byrd.  [Doc. 44 at 72-73; Doc. 44-9; Doc. 49-9 ¶¶ 7-8].  Byrd, however, yelled and cursed at Larkins, informed him that he was refusing to perform a task that was part of his duties as requested by his manager, and told

---

[12] Terry Oliver ("Oliver") and Grady Brown ("Brown") served as the Head Custodian and the Assistant Head Custodian, respectively, for the GSCD at all relevant times of this case.  [Doc. 52-2 ¶ 4].

[13] A security monitor was responsible for overseeing the safety and security of the ISC facility, which included monitoring the security cameras and access control into and out of the facility, as well as performing other duties that may be assigned, though the main job was to secure the facility grounds.  [Doc. 44 at 75-76; Doc. 49-9 (Larkins Aff.) ¶ 5; Doc. 49-10 (Maharaj Aff.) ¶ 5; Doc. 52-2 ¶ 55].

him that their relationship would change after this date.  [Doc. 44 at 57; Doc. 44-9;

Doc. 49-9 ¶ 8; Doc. 49-11 (Oliver Aff.) ¶ 7; Doc. 52-2 ¶ 57].

At the end of the day on March 16, 2021, Byrd emailed Larkins, with Gomez

and another individual copied thereon, a "Memo of Record," which stated, in

relevant part:

> The Facility Manager instructed [] Beard . . . to call [] Larkins to use
> the company vehicle to purchase office supplies (glue stick and
> ribbon) from Publix.  I ran into [] Larkins at the office of Head
> Custodian, [] Oliver, and from [] Larkins demeanor, I inquired: "You
> look like you don't [want] to go, [Larkins]."  His response was "No."
> Puzzled (and taken aback) I told [] Larkins "Never mind.  I'll just do
> it," and I went to purchase the supplies with my own personal
> vehicle.  After going back to my office to retrieve the funding, and
> returning back to [] Oliver's office on my way out the door, I told []
> Larkins that I wanted to see him upon my return.
>
> Upon my return, I had an intense conversation with [Larkins];
> beginning by me asking what was going on with him.  (His response
> was that there was nothing going on with him.  He had a great day
> today, everything was going really good.)  In our conversation, []
> Larkins felt that being asked to go get a glue stick and ribbon was
> personal and indicated: "I felt like, when [Beard] called me about the
> ribbon— you know I don't mind me doing stuff—but I felt like I'm a
> personal assistant.  I'm going to get glue and ribbon.  And when I told
> you about it, I felt like you got an attitude because I told you how I
> felt."
>
> I told [] Larkins: I'm your boss, I told [Beard] to call you, so you can
> go up there, because you have the company car, so we wouldn't have
> to use our personal vehicles to conduct GC[SD] business.
>
> [] Larkins indicated he didn't think that was GC[SD] business and I
> firmly told him that was not for him to decide and the directive falls
> under "Other Duties as Assigned."  [] Larkins then asked if I asked

him to go up there and buy some bread and water, if he has to go up there and do it, because I asked him to do it?

The conversation took a turn for the worst and I asked [] Larkins to leave the office.  [] Larkins—upon my request for him to leave—asked repeatedly to talk it out; and although I didn't think that I was getting through to [] Larkins and the atmosphere was getting heavy, I consented to continue and told [] Larkins that I would never have exhibited that type of attitude if [Gomez] would have asked me to do something.  I have never exhibited that type of attitude/behavior to my superior.

[] Larkins repeatedly stated that he doesn't get the distinction of buying supplies[,] glue sticks and ribbon[,] even when I compared it to the spray paint that he purchased from Home Depot to mark the Campus[] trees.  I told [] Larkins that when I ask him to do something, I ask you to do something because I need you to do it, and me (your boss) having to explain why I'm asking you to do something is totally inappropriate.

**Meeting Outcome**

1.   [] Larkins indicated that he felt that he was the only person (in the Security department) that was asked to run errands.  I indicated that he was my "go-to" person and I will curtail asking him to run errands for the [GCSD] and will try to divide the errands between him and his coworker going forward.

2.   [While] [] Larkins reiterat[ed] throughout the meeting (up until the end) that he felt that going to get the requested supplies was personal, and not understanding the full scope of 1) the supply request, 2) his "No" reaction to the directive, and 3) his lack of understanding of the situation even after our discussion, I informed him that this occurrence was the last incident of this nature.  If he does not follow future directives, it may be construed as insubordination and appropriate disciplinary action would follow.

[Doc. 44-9 at 1-2 (alteration omitted) (emphasis and all caps omitted)].[14]

On the following day, March 17, 2021, Byrd called a meeting with his direct subordinates, including Larkins, Aaron Maharaj ("Maharaj"), Oliver, and Brown, because he "wanted the team to know what the new management would be going forward," which was that while "he typically manage[d] from a human perspective because you can[]not always go by the book when managing people" and that he had "given the team a lot of lead-way to show his appreciation," that he would "be removing the human perspective and only following GC[SD] policies and procedures []."  [Doc. 44 at 81-82, 84-85; Doc. 44-10 at 1].  Larkins, Maharaj, Oliver, and Brown believed that Byrd's announced change in his management style was related to his interaction with Larkins the day prior, and Byrd admits that his change was in relation to the incident with Larkins.  [Doc. 44 at 83; Doc. 48 (Brown Dep.) at 24 p. 23; Doc. 49-9 ¶ 9; Doc. 49-10 ¶¶ 8-9; Doc. 49-11 ¶ 8].[15]

---

[14] Byrd also recorded the conversation with Larkins, though the recording has not been submitted to the Court.  [Doc. 44 at 67].

[15] In May 2021, Byrd advised Gomez that he believed that the Fair Labor Standards Act ("FLSA") was not being adhered to by non-exempt department security employees, including Larkins and Maharaj, and that the schedule needed to change to comply with FLSA by having the employees work two hours during the weekend and thirty-eight hours during the weekday, and Byrd communicated this schedule change to GSCD staff.  [Doc. 52-2 ¶ 61; Doc. 52-3 (Beard Sworn Stmt.) ¶ 6]; see also [Doc. 46 at 71 p. 70; Doc. 46-7; Doc. 49-10 ¶ 11].  Also in May 2021,

On June 8, 2021, Byrd issued Brown a "Letter of Direction," and though he informed Oliver, Brown's immediate supervisor, of his intent to issue Oliver's direct report this letter to be included in Brown's performance review, he did not provide Oliver an opportunity to have input regarding this letter. [Doc. 44 at 90-91, 173; Doc. 47-2]. Byrd had not previously advised Oliver about his concerns regarding Brown or his concerns regarding how Oliver managed Brown. [Doc. 44 at 92]. On the following day, June 9, Byrd conducted Oliver's final performance review, and, for the first time, Byrd rated Oliver with an "Improvement Needed" in certain areas. [Doc. 49-11 ¶ 9]; see also [id. at 6-8].

On this same day, Byrd also conducted Larkins' final performance review, and, for the first time, he gave Larkins an "Unsatisfactory" rating under the major responsibility of: "Individual, as a member of the ISC Facilities Team, will cooperate with other staff and relinquish personal interests in order to reach/achieve the common goal of the ISC Facilities Team and/or ISC Campus," as well as a "Needs Improvement" with regard to "Dependability." [Doc. 44 at 99, 102; Doc. 44-13; Doc. 49-9 at 6]; see also [Doc. 49-9 ¶ 10]. As a basis for his "Unsatisfactory" rating, Byrd commented, "See attached March 16, 2021 Memo of Record[.]" [Doc. 44-13 at 3; Doc. 49-9 at 6-10]; see also [Doc. 44 at 101; Doc. 49-9 ¶

---

GCSD hired a contracting company, LACOSTA, to provide janitorial services at the ISC facilities. [Doc. 52-2 ¶ 17].

10].[16]  On June 10, 2021, Byrd conducted Maharaj's final performance review, and, for the first time, he also gave Maharaj an "Improvement Needed" in one category under Major Responsibilities.  [Doc. 49-10 at 6-8]; see also [id. ¶ 12].

On June 11, 2021, Larkins emailed Michelle Burton ("Burton"), the Director of Internal Resolution and Compliance for GSCD, raising concerns of unfair treatment and retaliation regarding his final performance evaluation.  [Doc. 44 at 96-97; Doc. 47-15; Doc. 49-9 ¶ 11].  Burton initiated an internal investigation as to Larkins' complaint regarding his performance review, and she first met with Byrd on June 16, 2021, to discuss the complaint.  [Doc. 44 at 94, 97-99]; see also [Doc. 44-14; Doc. 52-2 ¶ 14].[17]

---

[16] Gomez testified that Byrd had advised him that he had conducted Larkins' performance evaluation and that he had cited the incident in March, to which Gomez told him that "there are consequences for all actions that are taken, both positive and negative," and that if you "decided, as his supervisor, to add that to his evaluation, as long as you can stand by whatever consequences, both good or bad, occur as a product of that," he was "not going to direct [him] at this time to change the[] evaluation."  [Doc. 46 at 49-50 pp. 48-49 (internal marks omitted)].

[17] Also during this time, Maharaj, Brown, and Oliver made separate complaints regarding Byrd and their performance evaluations.  [Doc. 44 at 152; Doc. 47-12; Doc. 48 at 33 p. 32, 36 p. 35; Doc. 49-10 ¶ 13; Doc. 49-11 ¶ 10].  While GCSD Policy GAE provides that the "performance ratings contained in personnel evaluations and professional development plans . . . and job performance shall not be subject . . . . to complaint under the provisions of [the] policy" and that the "termination, non-renewal, demotion, suspension or reprimand of any employee . . . and the revocation, suspension or denial of certificates of any employees . . . shall not be subject to complaint under the provisions of [the] policy," [Doc. 44-5 at 1-2], Batiste testified that an employee could not "grieve the results of a performance evaluation," but that an employee could "grieve if a process was not fairly

On June 25, 2021, Byrd sent an email to several individuals, with Gomez and Burton copied thereon, regarding a concern with respect to the alleged harassment of an employee, "L.M.,"[18] of the contracted company, LACOSTA, by Brown, who supervised L.M.  [Doc. 44 at 112-13, 127, 138-40, 147-48; Doc. 44-16 at 5; Doc. 46 at 128 p. 127; Doc. 47 at 141 p. 140, 165-67 pp. 164-66; Doc. 47-8 at 5-6; Doc. 48 at 67 p. 66; Doc. 52-2 ¶¶ 19, 23].  Gomez scheduled a meeting for later that day in response to Byrd's email,[19] and on July 1, 2021, Burton also asked that Byrd provide

---

followed," [Doc. 47 at 205-06 pp. 204-05].  The policy also provides that "[i]n no instance shall there be more than ten [] calendar days between the most recent alleged act about which a complaint may be filed and the first written notice of complaint is received," [Doc. 44-5 at 2], but Batiste testified that when a complaint involves sexual harassment or retaliation, for example, the ten-day window did not apply, [Doc. 47 at 206-07 pp. 205-06].  In any event, Larkins, Oliver, and Brown all filed their complaints within ten calendar days, and Maharaj filed his complaint fifteen calendar days after he received his evaluation.  [Doc. 44 at 152; Doc. 48 at 33 p. 32, 36 p. 35; Doc. 49-9 ¶ 11; Doc. 49-10 ¶ 13; Doc. 49-11 ¶ 10].

[18] Because the Court finds it unnecessary to refer to this non-party by her full name, she is referred to using only her initials.  See Jackson v. McCurry, 303 F. Supp. 3d 1367, 1371 n.1 (M.D. Ga. 2017), aff'd, 762 F. App'x 919 (11th Cir. 2019) (per curiam) (unpublished).

[19] Dena Tesch ("Tesch"), a Business Resource Advisor with LACOSTA, also responded to Byrd, thanking him for notifying them "of the situation" and advising him that she had "shared [his] email and communicated with [their] HR Department," which would "immediately, conduct an investigation with the LACOSTA team members."  [Doc. 44-16 at 4].  Tesch followed up with Byrd on June 30, 2021, and again on July 1, 2021, advising him that the "LACOSTA team members do not feel comfortable in talking with [GCSD HR]" and that their team was "working on a plan to create a comfortable work environment , mitigate risk for both of our organizations and complete the necessary scope of work."  [Id. at 3-4].  She also indicated that she would like to schedule a meeting with

information as to L.M.'s specific allegations.  [Doc. 44 at 118, 122; Doc. 44-16 at 1-2; Doc. 52-2 ¶ 25].  Byrd responded to Burton's email, explaining that the accused employee was Brown, that he was not sure whether the harassment was sexual, and that L.M. was a general cleaner with LACOSTA who claimed that Brown made her "feel uncomfortable."  [Doc. 44-16 at 2]; see also [Doc. 44 at 122-23; Doc. 52-2 ¶ 59].  At the direction of Batiste, Dr. Michelle Smith ("Smith"), Executive Director of Internal Resolution, as well as Joyce Spraggs ("Spraggs") and Brittany Sebastian, both of whom served as Director of Internal Resolution during the relevant period, investigated the allegations regarding L.M.  [Doc. 44 at 245-46; Doc. 47 at 51 p. 50, 148-50 pp. 147-49; Doc. 48 at 67-70 pp. 66-69; Doc. 49-11 ¶ 11].  Byrd spoke with Spraggs and Smith regarding what he knew about the alleged sexual harassment of L.M. by Brown, and Spraggs asked Byrd what time Brown and Oliver usually arrived at work so that she could meet with them.  [Doc. 44 at 245-46].[20]

---

LACOSTA's Senior District Manager/Director of Operations and Byrd to discuss the issue further.  [Id.].  Thereafter, Byrd followed up with Batiste and Burton.  [Id. at 2].

[20] Byrd, however, also continued to investigate L.M.'s complaint on his own, including meeting with L.M. twice and taking her statement.  [Doc. 44 at 137-38].  Sometime in June 2021, Byrd met with a LACOSTA contract management representative and L.M., at which time L.M. reported another encounter she had with Brown.  [Id. at 132-39; Doc. 47-3 at 1-2, 6-7; Doc. 47-8 at 1-2; Doc. 47-9 at 1-4; Doc. 52-3 ¶¶ 8-11].

On July 1, 2021, Byrd met with Burton and Batiste to review the findings of the Larkins' investigation,[21] [id. at 187, 200-02; Doc. 44-14; Doc. 47-14],[22] and on July 12, 2021, Karla Johnson ("Johnson"), President of LACOSTA, sent Batiste and Byrd an email, attaching statements from various LACOSTA employees regarding Brown and Oliver, which she noted had already been provided to Byrd on July 9, 2021, after he conducted a meeting informing all LACOSTA employees to not have any contact with Brown or Oliver, and that it was also her "understanding that [L.M.] was given a week off with pay authorized by [] Byrd while [GCSD] HR can

---

[21] Batiste, who is Black, sat in on Byrd's interviews with Burton, who is also Black, in response to Byrd's request for a different investigator.  [Doc. 44 at 96, 152-53; Doc. 47 at 130 p. 129]; see also [Doc. 44-18; Doc. 49-2 ¶ 84; Doc. 54 ¶ 84].  Byrd explained that he felt as if Burton had her "own narrative that she was trying to accomplish," but he had "no idea" why she would have a particular narrative. [Doc. 44 at 102-04].  Byrd had multiple meetings with Burton and Batiste regarding the investigation, and he submitted documents to be considered in relation to the performance evaluations.  [Id. at 182-83].

[22] On July 8, 2021, Byrd directed Brown and Oliver to communicate all [GCSD] requests and directives through the onsite LACOSTA manager, James Leach, and to not communicate directly with LACOSTA staff.  [Doc. 46 at 188 p. 187; Doc. 47-9 at 1-3].  Byrd asserts that Brown and Oliver disregarded his directive as they were observed on surveillance camera following L.M. into a custodian closet. [Doc. 46 at 188 p. 187; Doc. 47-9 at 1-3].  Byrd emailed Batiste and Gomez on July 9, 2021, advising them that the conversation he held with GCSD staff, including Oliver and Brown, was not adhered to and that to protect both GCSD and LACOSTA, he had asked L.M. "to take the night off until [he] could get a resolve to the situation."  [Doc. 47-9 at 1].  Byrd also advised Batiste and Gomez that he had requested L.M. to "write a simple statement" and that he had "attached a copy of the surveillance tape" for them to review the footage.  [Id.].

investigate the matter," [Doc. 52-4 at 4]; see also [id. ¶ 2].  Batiste responded to this email by thanking Johnson for providing the statements and indicating that she would investigate and follow up soon.  [Id. at 4].[23]

On this same day, July 12, Byrd met with Batiste and Burton, and he recorded this meeting during which Batiste asked Byrd how he ended up getting a statement from L.M. after she had advised him that they "were done with that," explaining to Byrd that they had "to go back to [LACOSTA's] HR" because "they have processes, they have to handle their employees similar to how [LACOSTA] is talking to all of their employees, they're reporting to their supervisor and [GCSD] employees are reporting to their supervisor, we are two separate entities[.]"  [Doc. 52-10 at 4-29]; see also [Doc. 44 at 218-19; Doc. 52-10 ¶¶ 1, 3].  Batiste further explained to Byrd that when he got involved, "it muddies the water," since she had "to follow their processes" and also "follow [GCSD's] processes," and that as far as she was concerned, the issue had been resolved and there was no need for a statement but that if she had a statement, she needed to give it to LACOSTA's HR.  [Doc. 52-10 at 7].  Byrd acknowledged that he was still "learning [GCSD's] policies and procedures because they're quite different than

---

[23] Batiste testified that she did not follow up with Johnson regarding the investigation because they "played telephone tag several times" and then shortly thereafter, LACOSTA canceled the contract with GCSD.  [Doc. 47 at 182-83 pp. 181-82].

where [he] came from" and that his "role or [] goal [was] to protect this young

lady," but Batiste explained that it was not his job and instead, it was "HR's job . .

. to make sure that in these situations, that people are treated fairly, that processes

are followed, and if there's any conflict, that's what each individual HR team is on

site for," and that Byrd's job was "to supervise and report any misdoings or

wrongdoings."  [Id. at 8].  Batiste again emphasized that if L.M. came to him, Byrd

needed to send her back to LACOSTA since she was a LACOSTA employee and

that HR would keep him "out of all of the frame and make sure that policies,

procedures [were] followed."  [Id.].

     Because Byrd had also sent L.M. home with pay, Batiste explained that

"[w]e don't send [LACOSTA] people home," and she again explained that the

"other company handles it and then their HR person works with [her], and then

we determine next steps, not [Byrd], but [HR] determine[s] next steps."  [Id. at 9-

10].  Batiste also explained that they only had L.M.'s side of the story but that they

also had to investigate all sides, and she provided the following example:

> [I]f I walked in here and said, "[] Byrd, I'm gonna issue you a letter of
> termination.  We talked on Friday and on Friday, I told you that the
> situation was handled between [LACOSTA] and [GCSD], that it had
> been resolved, not less than an hour or two later, you send me [] a
> statement from someone and I don't listen to you." . . . . And you said,
> "I did not understand, here's what I thought, the site supervisor[]" . .
> . "[a]ppeared with two employees for us to have a conversation," I'm
> giving you an opportunity to tell me there was not . . ., and that's what
> we're going to do in the other situation.  The first person comes that
> speaks to you doesn't mean that they're right, that's why you need

HR, because we're . . . mutual, we don't take any sides, but when you're saying it, we have to investigate and find out what's going on, and if that's the case, we'll guide you and that's it.

[Id. at 12-13].

After a conversation about facilitating L.M.'s return to work, Batiste again reiterated to Byrd that "HR knows how to send somebody home, and investigate, and handle those situations, it's not within the purview of what you do, just trust us and we'll take care of it." [Id. at 14]. Byrd again stated that he just wanted to "make sure that not only are we protecting the [GCSD] employees, but we're also protecting the [LACOSTA] employee," but Batiste reiterated again that it was not his job to do so as HR had "policies, [] procedures, and [] practices, and [also had] the option to call an attorney" and that "in an effort to protect the district, [] protect [Byrd], [] protect all employees," HR makes sure to "follow those practices[.]" [Id. at 14-16].[24]

---

[24] Byrd was never presented with a Letter of Direction for his handling of the L.M. complaint. [Doc. 44 at 136]. Subsequently, Byrd did not report to work from July 22, 2021, to August 3, 2021. [Id. at 188-89; Doc. 44-20]. On August 4, 2021, a meeting was held during which Gomez was present and various decisions and updates were outlined, including that the reporting structure Byrd had put into place on July 8, 2021, would be reverted back to original operations, that a camera would be removed from the custodial office, that Gomez would discuss HR's findings as to the internal investigation of his subordinate employees' complaints upon Byrd's return to work, and that there needed to be a discussion with Byrd regarding his role, responsibilities, and expectations, among other issues. [Doc. 46-18]. During the week of August 8, 2021, Byrd informed Gomez that BMS, a company GCSD had previously contracted with for janitorial services and that Byrd had reached out to about contracting with once again, had concerns about

On August 10, 2021, Burton and Batiste met with Byrd to review the findings of the internal investigations with respect to the other three subordinate employees.  [Doc. 44 at 187, 200-02; Doc. 44-14; Doc. 47-14].  Burton concluded that Byrd had engaged in unfair treatment as to Oliver, Brown, and Maharaj, and retaliation as to Larkins, as it pertained to their performance evaluations, and she made several recommendations, including that Byrd receive a Letter of Direction. [Doc. 44 at 202-04; Doc. 44-24; Doc. 47-10; Doc. 47-11; Doc. 47-14].

On August 24, 2021, Byrd's supervisor, Gomez, met with Byrd, at the request of Burton and Batiste, to issue Byrd the Letter of Direction dated August 23, 2021, which stated, in pertinent part:

> This letter will serve as a letter of direction in response to employee evaluation procedures during the 2020-2021 -school term.  During an internal investigation concerning complaints filed by several of your subordinates about their evaluations, it was determined that evaluation processes were not followed in accordance with [GCSD] employee evaluation guidelines.  Consequently, the feedback and evaluation results will be changed for [] Larkins, [] Maharaj, [] Oliver, and [] Brown.  One of the four evaluations was retaliatory.  The other three evaluations were considered unfair treatment.
>
> Based on your performance . . . . thus far, I feel it necessary to give you an additional opportunity to demonstrate that you are able to carry out your duties and responsibilities appropriately.  In light of the findings in the investigation, you are directed as follows:
>
> 1.   Refrain from all written and oral communication that may be construed as demeaning, sarcastic, and intimidating in nature, as

---

the treatment of female contract-hired employees by Oliver, but Gomez indicated that he did not want to discuss the issue.  [Doc. 52-2 ¶¶ 42-44; Doc. 52-3 ¶¶ 26-27].

well as refrain from any conduct that may lend itself to future claims of retaliation.

2.   Refrain from accessing the [GCSD] assigned email accounts of employees and sending emails under the guise of those employees.

3.   Refrain from requesting employees complete personal errands on your behalf and distribute all [GCSD] errands among employees in an equitable manner consistent with their job duties and responsibilities.

4.   Interact with all [GCSD] stakeholders, including your direct report employees, to perform your duties and responsibilities in a professional and courteous manner.

5.   Perform evaluations that reflect current year's performance and never base evaluations on retaliatory motives.

Failure to adhere to any of these directives may result in further disciplinary action, up to and including the termination of your employment with [GCSD].

According to [GCSD] policy, reprisal or retaliation against a person or persons filing a discrimination or sexual harassment complaint or any person(s) participating in the investigation or resolution of the complaint is prohibited.

Any employee who retaliates against such individual(s) due to participating in the complaint process shall be subject to disciplinary action. . . .

This document will be made a part of your annual evaluation.

[Doc. 44-24 at 1-2]; see also [Doc. 44 at 202-11].[25]  Two days later, on August 26, 2021, Byrd submitted his resignation via an email to Gomez, stating, "I believe the

---

[25] Gomez did not participate in the investigation, its findings, or the decision to issue Byrd the Letter of Direction, as his only role was to present the letter to Byrd. [Doc. 46 at 106-08 pp. 105-07, 251-55 pp. 250-54].  During his meeting with Byrd, Gomez told Byrd that he "still need[ed him] to be a supervisor" and that he "still need[ed him] to be the leader of the department."  [Doc. 44 at 213].  Gomez also met with Larkins, Maharaj, Oliver, and Brown to reiterate that Byrd was their

time for change has come[,] and with mixed emotions, I am submitting my letter of resignation as the ISC Facility Manager effective Monday, September 6, 2021. (Do note that I would be remiss if I did not admit that the recent events were the motivating factors that helped facilitate this decision/move[])[.]"  [Doc. 44-27 at 1]; see also [Doc. 44 at 237].  Byrd further stated to Gomez that he had "been fortunate to have supervisors that have been mentors, provided leadership guidance and encouragement, and have been champions for the business units [he] managed," and he thanked Gomez "for being one of those supervisors."  [Doc. 44-27 at 1].[26]

---

supervisor, that nothing had changed, and that Byrd would continue to assign them tasks.  [Doc. 49-9 ¶ 12; Doc. 49-10 ¶ 14; Doc. 49-11 ¶ 12].  Indeed, although Byrd alleges that he was treated unfairly because his supervisor rescinded several of his decisions, including his Letter of Direction to Brown, his decision to schedule employees to work 6 days consisting of 38 hours during the week and 2 hours on the weekend, and his placement of a camera outside the electrical closet, Byrd's primary job duties did not change.  [Doc. 44 at 170-71, 199, 215, 220-24; Doc. 44-2; Doc. 44-25; Doc. 52-2 ¶¶ 64-65].  Brown was never disciplined as a result of the L.M. investigation.  [Doc. 48 at 77 p. 76, 80-81 pp. 79-80].

[26] Byrd never filed a written complaint or grievance regarding himself during his employment with GCSD, though he was aware of GCSD policies and the grievance process and received annual training on certain topics, including sexual harassment, discrimination, and reports of abuse towards students.  [Doc. 44 at 28-32, 41-43; Docs. 44-4, 44-5, & 44-6].  Byrd also admits that no one asked him to resign, and that Gomez even reiterated to him that he was a valuable employee who he still needed on the team.  [Doc. 44 at 163].  On January 12, 2022, Gomez was contacted about providing a professional reference for Byrd, and the reference was characterized as "very positive [] with the information that [Gomez] was allowed to provide[.]"  [Doc. 45 (Allen Dep.) at 48-49 pp. 48-49].

Byrd filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on November 23, 2021, [Doc. 49-12 at 1], and on January 5, 2022, and February 4, 2022, he filed amended charges with the EEOC, [id. at 2-3]. On April 14, 2022, Byrd filed his original complaint in this case, see [Doc. 1], and on July 14, 2022, he filed an amended complaint against GCSD, alleging claims of race and color discrimination and retaliation under Title VII, race discrimination under § 1981, and a state law claim for a violation of the GWA, [Doc. 15]. GCSD moves for summary judgment as to all of Byrd's claims, [Doc. 49], which Byrd opposes, [Doc. 52]. GCSD has filed a reply in support of its motion, [Doc. 56], and the pending motion, [Doc. 49], is now ripe for ruling.[27]

## II.  SUMMARY JUDGMENT STANDARD

"Summary judgment shall be granted if the movant shows that there is 'no genuine issue as to any material fact', such that the movant is entitled to judgment as a matter of law." Jerome v. Barcelo Crestline, Inc., 507 F. App'x 861, 863 (11th Cir. 2013) (per curiam) (unpublished) (quoting Fed. R. Civ. P. 56(a)); see also Mathews v. Wells Fargo, 758 F. App'x 842, 843 (11th Cir. 2019) (per curiam) (unpublished) (citation omitted); Holmes v. Ga. ex rel. Strickland, 503 F. App'x 870, 872 (11th Cir. 2013) (per curiam) (unpublished) (citations omitted); Young v.

---

[27] Additional facts will be set forth as they become necessary for discussion of Byrd's claims and the issues presented in the pending motion for summary judgment.

FedEx Express, 432 F. App'x 915, 916 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted).  The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material facts, upon which the non-moving party must then submit specific facts showing a genuine issue for trial.  See Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hornsby-Culpepper v. Ware, 906 F.3d 1302, 1311 (11th Cir. 2018) (citation omitted); Premier Assocs., Inc. v. EXL Polymers, Inc., No. 1:08-cv-3490-WSD, 2010 WL 2838497, at *8 (N.D. Ga. July 19, 2010) (citations omitted), aff'd in part, 507 F. App'x 831 (11th Cir. 2013) (unpublished).

"[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation[s] or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  Jackson v. B & L Disposal, Inc., 425 F. App'x 819, 820 (11th Cir. 2011) (per curiam) (unpublished) (first alteration in original) (citation and internal marks omitted); see also Shuler v. Ingram & Assocs., 441 F. App'x 712, 715 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted); Bryant v. U.S. Steel Corp., 428 F. App'x 895, 897 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted).  "A factual dispute is genuine if it has a real basis in the record and the evidence is such that a reasonable jury could rule in favor of the nonmovant."  Phillips v. Legacy Cabinets, 87 F.4th 1313, 1320 (11th Cir. 2023) (citation omitted).  "Although [the

Court] view[s] all the evidence and draw[s] all inferences in the light most favorable to the nonmoving party, [i]f the non-moving party fail[s] to make a showing on an essential element of his case with respect to which he ha[s] the burden of proof, then the entry of judgment as a matter of law is appropriate." Lowe v. Exel, Inc., 758 F. App'x 863, 865 (11th Cir. 2019) (per curiam) (unpublished) (fourth, fifth, and sixth alterations in original) (citations and internal marks omitted).

"Speculation or conjecture cannot create a genuine issue of material fact." Shuler, 441 F. App'x at 715 (citation omitted); see also Perry v. Pediatrix Med. Grp. of Ga., 841 F. App'x 174, 177 (11th Cir. 2021) (per curiam) (unpublished) (citation omitted); Howard v. Or. Television, Inc., 276 F. App'x 940, 941 (11th Cir. 2008) (per curiam) (unpublished) (citation omitted); Goodman v. Ga. Sw., 147 F. App'x 888, 891 (11th Cir. 2005) (per curiam) (unpublished) (citation and internal marks omitted) ("[A]ll reasonable inferences arising from the undisputed facts should be made in favor of the nonmovant, but an inference based on speculation and conjecture is not reasonable."). "Moreover, the non-moving party cannot create a genuine issue through evidence that is 'merely colorable' or 'not significantly probative.'" Morales v. Ga. Dep't of Human Res., 446 F. App'x 179, 181 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted); see also Breeding v. Integrated Behav. Health Inc., No. 22-10374, 2023 WL 3735341, at *2 (11th Cir. May 31, 2023)

(per curiam) (citation omitted) (explaining that "conclusory allegations have no probative value at summary judgment unless supported by specific evidence"); Hall v. Dekalb Cnty. Gov't, 503 F. App'x 781, 786 (11th Cir. 2013) (per curiam) (unpublished) (citation omitted) ("[M]ere conclusions, unsupported factual allegations, and statements that are based on belief, as opposed to personal knowledge, are insufficient to overcome a summary judgment motion."). Indeed, "[t]o overcome a motion for summary judgment, the nonmoving party must present more than a scintilla of evidence supporting his position—rather, there must be enough of a showing that the jury could reasonably find for that party." Siddiqui v. NetJets Aviation, Inc., 773 F. App'x 562, 563 (11th Cir. 2019) (per curiam) (unpublished) (citation and internal marks omitted); see also James v. City of Montgomery, 823 F. App'x 728, 731 (11th Cir. 2020) (per curiam) (unpublished) (citation omitted); Wesley v. Austal USA, LLC, 776 F. App'x 638, 643 (11th Cir. 2019) (per curiam) (unpublished) (citation omitted); Mazzola v. Davis, 776 F. App'x 607, 609 (11th Cir. 2019) (per curiam) (unpublished) (citation omitted).

In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment," Anyanwu v. Brumos Motor Cars, Inc., 496 F. App'x 943, 945-46 (11th Cir. 2012) (per curiam) (unpublished) (citation and internal marks omitted), and "[w]here the record taken as a whole could not lead a rational trier

of fact to find for the non-moving party, summary judgment for the moving party is proper," Premier Assocs., Inc., 2010 WL 2838497, at *9 (first alteration in original) (citation and internal marks omitted); see also Ellison v. St. Joseph's/Candler Health Sys., Inc., 775 F. App'x 634, 643 (11th Cir. 2019) (unpublished) (citation omitted).  "Summary judgment is required where the non-moving party's response to a motion is merely a repetition of his conclusional allegations and is unsupported by evidence showing an issue for trial."  Comer v. City of Palm Bay, 265 F.3d 1186, 1192 (11th Cir. 2001) (per curiam) (citation and internal marks omitted).  That is, "[t]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  Evans v. Birmingham Hide & Tallow Co., No. 22-10912, 2023 WL 3198240, at *2 (11th Cir. May 2, 2023) (per curiam) (citation and internal marks omitted).  Finally, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  Scott v. Harris, 550 U.S. 372, 380 (2007); see also Harrison v. Macy's Inc., CIVIL ACTION FILE No. 1:17-cv-03257-TCB-AJB, 2022 WL 1298595, at *5 (N.D. Ga. Jan. 22, 2022) (citation omitted), adopted by 2022 WL 1297992, at *4 (N.D. Ga. Mar. 21, 2022), aff'd, 2023 WL 6140827 (11th Cir. Sept. 20, 2023) (per curiam); Dockens v. Dekalb Cnty. Sch. Sys., CIVIL ACTION FILE NO. 1:07-CV-1345-

CAP/AJB, 2010 WL 11505568, at *7 (N.D. Ga. July 19, 2010) (citation omitted), adopted by 2010 WL 11507838, at *1 (N.D. Ga. Aug. 20, 2010), aff'd, 441 F. App'x 704 (11th Cir. 2011) (per curiam) (unpublished).

## III.  DISCUSSION

Byrd alleges claims of race and color discrimination and retaliation in violation of Title VII, as well as race discrimination in violation of § 1981, and a state law claim for a violation of the GWA.  [Doc. 15].[28]  GCSD makes several arguments in support of its motion for summary judgment as to these claims.  See [Doc. 49-1].  First, GCSD asserts that Byrd's race and color discrimination claims

---

[28] Byrd testified that when referring to "color discrimination," he was distinguishing between the Caucasian skin tone and the Black skin tone rather than making a distinction between various skin tones of Black individuals.  [Doc. 44 at 51].  "Title VII recognizes separate claims for race and color discrimination." Reeves v. Columbus Consol. Gov't, CASE NO. 4:21-cv-00080-CDL, 2021 WL 5451146, at *2 (M.D. Ga. Nov. 22, 2021) (citation omitted).  "When a person alleges that []he was treated different than someone of another race and color, they often mean that they were the victim of racial discrimination," but "sometimes persons of the same race may be treated differently based on differences in the pigmentation of their skin" and "[s]uch disparate treatment may give rise to a 'color' discrimination claim, but not a 'race' discrimination claim." Id. (emphasis and citations omitted).  "In his response to [GCSD's] motion for summary judgment, [Byrd] makes no argument about discrimination based on color separate from his arguments about race discrimination," as he "apparently treats such claims as equivalent," and therefore, the Court "will do likewise and will not separately analyze his claims of discrimination based on color." Fluker v. News Grp., Inc., Civil Action No. 1:06-CV-2299-BBM, 2008 WL 11333434, at *8 n.9 (N.D. Ga. June 30, 2008), adopted by 2008 WL 11336365, at *4 (N.D. Ga. Aug. 7, 2008). "To the extent that [Byrd] has asserted distinct claims of discrimination based on color, they are abandoned." Id. (citations omitted).

fail because he cannot establish a prima facie case since he cannot show he suffered an adverse employment action, or that he was treated differently than similarly situated employees from outside his protected class, and even if he could establish a prima facie case, he has failed to offer evidence to show that GCSD's legitimate, non-discriminatory reasons for its actions were pretext for discrimination.  [Id. at 6-14].  GCSD also contends that Byrd has failed to present a prima facie case of retaliation under Title VII because he cannot show that he suffered a materially adverse employment action or that his reporting of L.M.'s complaint was the but-for cause of his receipt of a Letter of Direction.  [Id. at 15-17].  GCSD further argues that even if Byrd could establish a prima facie case of retaliation, it had legitimate, non-retaliatory reasons for its actions, which he has failed to show were pretextual. [Id. at 17-18]; see also [Doc. 56 at 9-10].[29]  Finally, GCSD argues that Byrd's state law claim under the GWA fails because he cannot show that he engaged in protected activity, that he suffered an adverse employment action, or that there was a causal connection between any protected activity and any alleged retaliatory treatment.  [Doc. 49-1 at 18-24].  GCSD also argues that Byrd cannot establish

---

[29] GCSD also points out that it is unclear as to whether Byrd intended to assert his retaliation claim under § 1981, but that to the extent he did, it would be analyzed under the same standard as his Title VII retaliation claim.  See [Doc. 49-1 at 15 n.5 (citations omitted)].

pretext to support his GWA claim.  [Id. at 24-25].[30]  The Court will address each of these arguments.

Title VII prohibits discrimination in employment decisions on the basis of "race, color, religion, sex, or national origin."  See 42 U.S.C. § 2000e-2(a)(1); Powers v. Sec'y, U.S. Homeland Sec., 846 F. App'x 754, 757 (11th Cir. 2021) (per curiam)

---

[30] GCSD also points out that Byrd "listed discrimination 'on the basis of sex' in the Joint Preliminary Report," but that he "has failed to exhaust or plead this claim," since he "did not include sex discrimination in his EEOC charges," and he "did not plead sex discrimination in his [c]om[plaint or [a]mended [c]omplaint."  [Doc. 49-1 at 14-15 (citations omitted)]; see also [Doc. 8 at 2; Doc. 49-12].  Byrd does not address GCSD's arguments in this regard, see generally [Doc. 52], and a "legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed," Brooks v. Ins. House, Inc., 322 F. App'x 782, 783 n.* (11th Cir. 2009) (per curiam) (unpublished) (citation and internal marks omitted); see also Resolution Tr. Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) (citation omitted) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."); Chandler v. Volunteers of Am., N. Ala., Inc., Civil Action No. 10–S–2961–NW, 2013 WL 832133, at *21 (N.D. Ala. Feb. 28, 2013) (dismissing plaintiff's retaliation and hostile work environment claims "due to her failure to offer any meaningful argument in opposition to defendant's motion for summary judgment on those claims"), aff'd, 598 F. App'x 655 (11th Cir. 2015) (per curiam) (unpublished); Burnette v. Northside Hosp., 342 F. Supp. 2d 1128, 1140 (N.D. Ga. 2004) (citations omitted) (noting that plaintiff's failure to address a challenged claim on summary judgment warranted dismissal of that claim); Bute v. Schuller Int'l, Inc., 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) ("Because plaintiff has failed to respond to this argument or otherwise address this claim, the Court deems it abandoned."); Welch v. Delta Air Lines, Inc., 978 F. Supp. 1133, 1137 (N.D. Ga. 1997) ("Plaintiff's failure to respond to [d]efendant's argument alone entitles [d]efendant to summary judgment on these claims."). Because Byrd has not addressed any claim for sex discrimination, he has abandoned this claim to the extent he intended to assert it, and GCSD's summary judgment motion is due to be granted as to this claim, see Bute, 998 F. Supp. at 1477, and it will not be addressed further in this Final Report, Recommendation, and Order.

(unpublished) (citation omitted); <u>see also</u> <u>Blue v. Dunn Constr. Co.</u>, 453 F. App'x 881, 883 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted); <u>Barnes v. Mayor & Aldermen of City of Savannah</u>, CASE NO. CV419-048, 2020 WL 6806823, at *13 (S.D. Ga. Nov. 19, 2020) (citation omitted).   Title VII also prohibits an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."   42 U.S.C. § 2000e-3(a); <u>see also</u> <u>Fitzgibbon v. Fulton Cnty.</u>, 842 F. App'x 385, 388 (11th Cir. 2021) (per curiam) (unpublished) (citation omitted); <u>Smithers v. Wynne</u>, 319 F. App'x 755, 756 (11th Cir. 2008) (per curiam) (unpublished) (citation omitted).   In addition, § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts[31] . . . as is enjoyed by white citizens," 42 U.S.C. § 1981(a), and "prohibits an employer from retaliating against its employee[s] in response to the employee[s]'[] complaint of race-based

---

[31] "Make and enforce contracts" encompasses "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."   42 U.S.C. § 1981(b) (internal marks omitted).

discrimination," Braswell v. Allen, 586 F. Supp. 2d 1297, 1310 (M.D. Ala. 2008) (citation omitted).[32]

Byrd may support his claims of discrimination and retaliation by offering either direct or circumstantial evidence.  Dixon v. The Hallmark Cos., 627 F.3d 849, 854 (11th Cir. 2010) (citation omitted); see also Foy v. Barrett, CIVIL ACTION NO. 5:18-CV-276 (MTT), 2020 WL 7497383, at *3 (M.D. Ga. Dec. 21, 2020); Obester v. Lucas Assocs., Inc., Civil Action File No. 1:08–CV–03491–MHS–AJB, 2010 WL 8292401, at *25 (N.D. Ga. Aug. 2, 2010) (citation omitted), adopted by 2010 WL 8304884, at *4 (N.D. Ga. Sept. 7, 2010).  "Direct evidence is evidence which, if believed, would prove the existence of a fact in issue without inference or presumption.'"  Gray v. Deloitte LLP, 849 F. App'x 843, 844 (11th Cir. 2021) (per curiam) (unpublished) (citation omitted).  "Where direct evidence is present, summary judgment is not appropriate."  Bryant v. Jones, 696 F. Supp. 2d 1313, 1324 (N.D. Ga. 2010) (footnote and citation omitted).

---

[32] Moreover, under the GWA, "[n]o public employer shall retaliate against a public employee for disclosing a violation of or noncompliance with a law, rule, or regulation to either a supervisor or a government agency, unless the disclosure was made with knowledge that the disclosure was false or with reckless disregard for its truth or falsity."  O.C.G.A. § 45-1-4(d)(2).  "'Law, rule, or regulation' includes any federal, state, or local statute or ordinance or any rule or regulation adopted according to any federal, state, or local statute or ordinance."  O.C.G.A. § 45-1-4(a)(2).

Where, as here, there is no direct evidence of discrimination or retaliation,[33] the "well established rule in the Eleventh Circuit is that discrimination [and retaliation] claims brought under . . . § 1981 . . . and Title VII, and based on the same set of facts, are to be analyzed the same way, and . . . the appropriate analytical framework is the burden shifting analysis" articulated in <u>McDonnell Douglas Corp.</u>, 411 U.S. at 792.  <u>Farmer v. Bd. of Regents of the Univ. Sys. of Ga.</u>, CIVIL ACTION NO. 1:10-CV-2148-ODE, 2012 WL 12871490, at *6 n.5 (N.D. Ga. Sept. 17, 2012) (citations omitted), <u>aff'd</u>, 589 F. App'x 913 (11th Cir. 2014) (per curiam) (unpublished); <u>see also</u> <u>Lapham v. Walgreen Co.</u>, 88 F.4th 879, 889 (11th Cir. 2023) (citation omitted); <u>Worley v. City of Lilburn</u>, 408 F. App'x 248, 250 (11th Cir. 2011) (per curiam) (unpublished) (citations omitted) ("The elements required to establish retaliation claims under § 1981 are the same as those required for Title VII claims.").[34]  Under this framework, Byrd must first present a prima facie case

---

[33] Byrd conclusory asserts that "the evidence establishes direct, as well as circumstantial evidence from which a reasonable juror could find that [ GCSD] took adverse actions against [ him]," [Doc. 52 at 23]; however, Byrd appears to have "improperly commingled the methodology for proving [discrimination and] retaliation with direct evidence," and in any event, "if the employment action in question is not an adverse employment action under Title VII, then direct evidence that the employer took the action in retaliation for plaintiff's statutorily protected activities would not preclude summary judgment," <u>Phillips</u>, 2016 WL 5429666, at *14 n.35 (alteration, citations, and internal marks omitted).

[34] Additionally, "[c]laims brought under the GWA are generally evaluated under the <i>McDonnell-Douglas</i> burden-shifting analysis used in Title VII retaliation cases." <u>Watson v. City of Hampton</u>, CIVIL ACTION NO. 1:19-CV-3058-JPB-JSA, 2020 WL

of discrimination or retaliation, but the framework "is 'not intended to be an inflexible rule.'"   Young v. United Parcel Serv., Inc., 575 U.S. 206, 228 (2015) (citation omitted).  "Rather, [Byrd] . . . may establish a prima facie case by showing actions taken by [ GCSD] from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under Title VII [and § 1981]."   Id. (citation and internal marks omitted).  "The burden of making this showing is not onerous."   Id. (citation and internal marks omitted).

If Byrd establishes a prima facie case as to each of his claims, an inference of discrimination and retaliation arises, and the burden shifts to GCSD to articulate legitimate, non-discriminatory and non-retaliatory reasons for its actions.  Berman v. Orkin Exterminating Co., 160 F.3d 697, 702 (11th Cir. 1998); see also Jefferson v. Burger King Corp., 505 F. App'x 830, 833 (11th Cir. 2013) (per curiam) (unpublished) (citation omitted); Entrekin v. City of Panama City Fla., 376 F. App'x 987, 997 (11th Cir. 2010) (per curiam) (unpublished) (citation omitted); Batts v. Silver Line Bldg. Prods. Corp., Civil Action File No. 1:08-CV-3355-WSD-ECS, 2010

---

10223177, at *5 (N.D. Ga. Jan. 23, 2020) (citing Lamar v. Clayton Cnty. Sch. Dist., 605 F. App'x 804, 806 (11th Cir. 2015) (per curiam) (unpublished)), adopted by 2020 WL 10223302, at *3 (N.D. Ga. Mar. 8, 2020); see also West v. City of Albany, CASE NO.: 1:15-CV-102 (LAG), 2019 WL 11503005, at *13 (M.D. Ga. Mar. 21, 2019) (citation omitted), aff'd, 830 F. App'x 588 (11th Cir. 2020) (per curiam) (unpublished).

WL 966860, at *9 (N.D. Ga. Feb. 22, 2010) (citation omitted), adopted by 2010 WL 966861, at *2 (N.D. Ga. Mar. 12, 2010).  GCSD's burden, one of production and not of persuasion, is "exceedingly light."  Smith v. Horner, 839 F.2d 1530, 1537 (11th Cir. 1988) (citations and internal marks omitted); see also Bagwell v. Peachtree Doors & Windows, Inc., Civil Action File No. 2:08–CV–191–RWS–SSC, 2011 WL 1497831, at *21 (N.D. Ga. Feb. 8, 2011) (citations omitted), adopted by 2011 WL 1497658, at *1 (N.D. Ga. Apr. 19, 2011).  "It is not necessary that the court believe the evidence; the court's analysis can involve no credibility assessment." Matthews v. City of Dothan, No. 1:04–CV–640–WKW, 2006 WL 3742237, at *5 (M.D. Ala. Dec. 18, 2006) (citation and internal marks omitted).  "So long as [ GCSD] articulates 'a clear and reasonably specific' non-discriminatory [and non-retaliatory] basis for its actions, it has discharged its burden of production." Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 770 (11th Cir. 2005) (per curiam) (citation omitted).

If GCSD meets its burden of production with respect to each claim, the inference of discrimination and retaliation is erased, and the burden shifts back to Byrd to show that GCSD's articulated reasons are merely a pretext for discrimination and retaliation.  Entrekin, 376 F. App'x at 997 (citation omitted); Berman, 160 F.3d at 702; see also Wigfall v. St. Leo Univ., Inc., 517 F. App'x 910, 912 (11th Cir. 2013) (per curiam) (unpublished); Saunders v. Emory Healthcare,

Inc., 360 F. App'x 110, 113, 115 (11th Cir. 2010) (per curiam) (unpublished) (citations omitted). That is, "[o]nce [ GCSD] proffers [] legitimate, non-discriminatory [and non-retaliatory] reason[s], in order to survive summary judgment, [ Byrd] must proffer sufficient evidence to create a genuine issue of material fact regarding whether each of [GCSD's] . . . articulated reasons [are] pretextual." Dockery v. Nicholson, 170 F. App'x 63, 66 (11th Cir. 2006) (per curiam) (unpublished) (last alteration in original) (citation and internal marks omitted); Bagwell, 2011 WL 1497831, at *25 (citation omitted). Despite this burden-shifting framework, the "ultimate burden of persuading the trier of fact that [ GCSD] intentionally discriminated [or retaliated] against [ Byrd] remains at all times with [ Byrd]." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981) (citations omitted); see also Walker v. St. Joseph's/Candler Health Sys., Inc., 506 F. App'x 886, 888 (11th Cir. 2013) (per curiam) (unpublished) (citation omitted).

## A.     Race and Color Discrimination Claims

Byrd alleges that GCSD discriminated against him based on his race and color when it investigated the complaints of four subordinate employees after their receipt of their final performance evaluations, in violation of GCSD policies and procedures, which ultimately led to the issuance of a Letter of Direction on August 24, 2021, and Byrd's subsequent resignation on August 26, 2021, to be effective as of Monday, September 6, 2021.  [Doc. 15 ¶¶ 40, 51-54, 57-58; Doc. 52 at 1, 23-27].

GCSD moves for summary judgment as to Byrd's race and color discrimination claims, arguing that he has failed to establish a prima face case, and even if he could, he has not shown that its legitimate, non-discriminatory reasons for the alleged adverse employment actions were pretext for discrimination.  [Doc. 49-1 at 6-14; Doc. 56 at 2-7].

>       1.      *Prima Facie Case*

 As explained, in the absence of direct evidence, the Court applies the familiar McDonnell Douglas burden-shifting framework, under which Byrd bears the initial burden of presenting sufficient circumstantial evidence to state a prima facie case of discrimination.  See Burke-Fowler v. Orange Cnty., 447 F.3d 1319, 1323 (11th Cir. 2006) (per curiam); see also Burdine, 450 U.S. at 254; Pinder v. John Marshall Law Sch., LLC, 11 F. Supp. 3d 1208, 1216-17 (N.D. Ga. 2014) (citations omitted).  To establish a prima face case of race or color discrimination, Byrd must show that: "(1) []he belongs to a protected class; (2) []he suffered an adverse employment action; (3) []he was qualified for the position; and (4) []he was treated less favorably than a similarly-situated individual outside his protected class." Franks v. Chitwood, 572 F. Supp. 3d 1304, 1343 (N.D. Ga. 2021) (citation omitted); see also Phillips, 87 F.4th at 1321 (citation omitted).

 In its motion for summary judgment, GCSD does not dispute that Byrd, who is Black, is a member of a protected class, or that he was qualified for his job.  See

[Doc. 49-1 at 6-11].  Rather, GCSD challenges whether Byrd has established the second element a prima facie case, arguing that none of its "actions constitute adverse employment actions as they did not affect the terms and conditions of [Byrd's] employment."  [Doc. 56 at 3]; see also [Doc. 49-1 at 6-10].  GCSD also argues that "[i]n addition to not suffering an adverse employment action, [Byrd] has offered no comparator who was treated more favorably."  [Doc. 49-1 at 10 (citation omitted)].  In response, Byrd contends that he "has established a triable issue of fact with regard to his claims of discrimination," [Doc. 52 at 23 (emphasis and all caps omitted)], but as GCSD points out, he "fails to identify any adverse action or to offer any evidence showing that the [L]etter of [D]irection or [GCSD's] investigations into complaints against him had a punitive effect on his employment relationship with [GCSD]," [Doc. 56 at 3].  For the reasons that follow, the Court finds that Byrd has failed to show that he suffered an actionable adverse employment action.

Whether Byrd has suffered an adverse employment action is determined on a case-by-case basis, Hanley v. Sports Auth., 143 F. Supp. 2d 1351, 1356 (S.D. Fla. 2000) (citation omitted), and "not all conduct by an employer negatively affecting an employee constitutes adverse employment action," Davis v. Town of Lake Park, 245 F.3d 1232, 1238 (11th Cir. 2001) (citations omitted), overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006).  Rather,

only that conduct which satisfies a "threshold level of substantiality," by "impact[ing] the terms, conditions, or privileges of the plaintiff's job in a real and demonstrable way," is actionable under Title VII and § 1981. Id. at 1239 (citations and internal marks omitted); see also Grimsley v. Marshalls of MA, Inc., 284 F. App'x 604, 608 (11th Cir. 2008) (per curiam) (unpublished).  And, "[w]hen a complained-of adverse employment action is not an ultimate employment decision, such as a termination, failure to hire, or demotion, the conduct at issue must substantially alter the employee's compensation, terms, conditions, or privileges of employment, or deprive him . . . of employment opportunities." Franks, 572 F. Supp. 3d at 1344 (alterations, citation, and internal marks omitted). Accordingly, "to prove adverse employment action in a case under Title VII's anti-discrimination clause, [ Byrd] must show a *serious and material* change in the terms, conditions, or privileges of employment." Davis, 245 F.3d at 1239.  Furthermore, "the employee's subjective view of the significance and adversity of the employer's action is not controlling"; instead, "the employment action must be materially adverse as viewed by a reasonable person in the circumstances." Id. at 1239-40 (footnote omitted) (citing Doe v. Dekalb Cnty. Sch. Dist., 145 F.3d 1441, 1453 (11th Cir. 1998)).

First, it appears that Byrd contends that GCSD's decision to investigate the four employee complaints that arose out of their final performance reviews was in

violation of GCSD policies and procedures and constitutes an adverse employment action.  See [Doc. 52 at 24].  Byrd, however, "has not shown that the investigation . . . changed the form or conditions of his employment, let alone effected any change in a 'materially adverse' way."  Kuhn v. Washtenaw Cnty., 709 F.3d 612, 626 (6th Cir. 2013); see also Henderson v. City of Birmingham, 826 F. App'x 736, 741 (11th Cir. 2020) (per curiam) (unpublished) (citation and internal marks omitted) (finding plaintiff "did not suffer a substantial adverse employment action," where he alleged that he was "unfairly subjected to formal investigations," since "an internal investigation–like any alleged adverse employment action–is not sufficient to state a discrimination claim if it did not cause him any . . . negative job consequences"); Rademakers v. Scott, 350 F. App'x 408, 413 (11th Cir. 2009) (per curiam) (unpublished) (finding "the investigation itself" was not a materially adverse action); Jenkins v. Tuscaloosa City Bd. of Educ., 72 F. Supp. 3d 1238, 1261 (N.D. Ala. 2014) (citation and internal marks omitted) (explaining that an "internal investigation is not an adverse employment action when it does not result in a significant change in employment status, such as termination, demotion, failure to promote, significant reassignment or a significant change in benefits"); Davis v. City of Lake City, Case No. 3:10–cv–1170–J–34TEM, 2013 WL 12091324, at *10 (M.D. Fla. Mar. 15, 2013) (citations omitted) (explaining that the "mere initiation of an internal affairs investigation against an

53

employee is not a 'materially adverse' action"), aff'd, 553 F. App'x 881 (11th Cir. 2014) (unpublished); Rogers v. Ga. Dep't of Corr., Civil Action No. 5:10–CV–499(MTT), 2012 WL 5398804, at *7 (M.D. Ga. Nov. 2, 2012) (footnote and citation omitted) (explaining that the "Eleventh Circuit has held that initiation of an internal investigation against an employee does not constitute an adverse employment action").[35]

Similarly, "the reprimand and/or discipline resulting from the [i]nternal [i]nvestigation[, including the Letter of Direction, is] not [an] adverse employment action[] because [Byrd] does not allege—and nothing in the record suggests— that it altered his employment status[.]" Washington v. Se. Pa. Transp. Auth., CIVIL ACTION NO. 19-4213, 2021 WL 2649146, at *19 (E.D. Pa. June 28, 2021) (citation omitted); see also Chapman v. U.S. Postal Serv., 442 F. App'x 480, 484 (11th Cir. 2011) (per curiam) (unpublished) (citations omitted) (finding plaintiff "did not sufficiently allege an adverse employment action" where "she received a letter of

---

[35] While Byrd maintains that the review of the employees' complaints centered around their performance evaluations violated GCSD's GAE policy, since it specifically excludes "performance ratings contained in personnel evaluations and professional development plans" from being subject to complaint, [Doc. 44-5 at 1], Batiste testified that while an employee could not "grieve the results of a performance evaluation," an employee could "grieve if a process was not fairly followed," which was the nature of the four employee complaints that HR had received, [Doc. 47 at 205-06 pp. 204-05]; see also [Doc. 47-10; Doc. 47-11; Doc. 47-12; Doc. 47-14; Doc. 47-15; Doc. 47-16; Doc. 48-3; Doc. 49-9 ¶¶ 10-11; Doc. 49-10 ¶¶ 12-13; Doc. 49-11 ¶¶ 9-10].

warning and had an investigative interview, but did not allege that any of these actions resulted in a serious and material change in the terms, conditions, or privileges of employment").[36]   That is, "disciplinary memoranda are not sufficiently adverse if they did not cause the plaintiff any present or foreseeable future economic injury." Dabney v. Mayorkas, CIVIL ACTION NO. 1:20-CV-0336-CAP-WEJ, 2022 WL 1177272, at *6 (N.D. Ga. Feb. 7, 2022) (citation and internal marks omitted), aff'd sub nom. Dabney v. Sec'y, U.S. Dep't of Homeland Sec., No. 22-11184, 2023 WL 2583500 (11th Cir. Mar. 21, 2023) (per curiam); see also Rhodes v. Napolitano, 656 F. Supp. 2d 174, 183 (D.D.C. 2009) (explaining that even if the letter of counseling "were a part of plaintiff's personnel file, the issuance or existence of the letter does not constitute an adverse employment action for the purposes of a discrimination claim"); Ausby v. Florida, 624 F. Supp. 2d 1353, 1365 (M.D. Fla. 2008) (citations omitted) (finding the written reprimand, which was "part of [the] formal disciplinary process, [did] not constitute an adverse employment action because [plaintiff] [did] not provide[] any evidence showing

---

[36] Although Byrd argues that GCSD's decision to rescind certain actions he took in relation to the employees who complained equates with the GCSD's "rescission of his authority to supervise employees," [Doc. 52 at 4, 6-7], the undisputed evidence shows that neither Byrd's supervisory authority, nor his job title or position, were rescinded, but in fact, Gomez met with the four employees who complained to reiterate that Byrd was their supervisor, that nothing had changed, and that Byrd would continue to assign them tasks, [Doc. 49-9 ¶ 12; Doc. 49-10 ¶ 14; Doc. 49-11 ¶ 12], and Byrd's primary job duties did not change, [Doc. 44 at 170-71, 199, 215, 220-24; Doc. 44-2; Doc. 44-25; Doc. 52-2 ¶¶ 64-65].

what tangible impact the [r]eprimand had on any term or condition of her employment"). Thus, as GCSD points out, Byrd failed "to offer any evidence showing that the [L]etter of [D]irection or [GCSD's] investigations into complaints against him had a punitive effect on his employment relationship with [GCSD]," [Doc. 56 at 3], and he has therefore failed to show he suffered a materially adverse employment action based on these occurrences.

GCSD also argues that Byrd's "voluntary resignation is not a constructive discharge," as "the evidence does not paint a picture of intense, intolerable harassment usually seen in cases of constructive discharge." [Doc. 49-1 at 8-10 (citation and internal marks omitted)]. Although Byrd conclusory asserts on the first page of his response in opposition to GCSD's summary judgment motion that "he was constructively discharged based upon illegal and intolerable conditions," [Doc. 52 at 1], he does not otherwise address GCSD's arguments as to constructive discharge or whether his resignation constitutes a constructive discharge in this case, see generally [Doc. 52]. Indeed, Byrd "makes no attempt to address the 'constructive discharge' in the argument section of his brief or to point to any legal authority under which his subjective feelings of that he couldn't work under the conditions constitute an actionable constructive discharge." Hawthorne v. Sears Termite & Pest Control, Inc., 309 F. Supp. 2d 1318, 1327 (M.D. Ala. 2003); see also [Doc. 52]. Although there "is no burden upon a district court to distill every

potential argument that could be made based upon the materials before it on summary judgment," as "the onus is on the parties to formulate arguments," Hawthorne, 309 F. Supp. 2d at 1327 (citations omitted), and it appears that Byrd has abandoned his constructive discharge theory by failing "to substantively respond to [GCSD's] motion for summary judgment," Reed v. Huntsville City Bd. of Educ., Case No. CV-06-S-1071-NE, 2009 WL 10703860, at *11 n.57 (N.D. Ala. Feb. 24, 2009) (citations omitted); see also Resolution Tr. Corp., 43 F.3d at 599; Burnette, 342 F. Supp. 2d at 1140; Bute, 998 F. Supp. at 1477; Welch, 978 F. Supp. at 1137 ("Plaintiff's failure to respond to [d]efendant's argument alone entitles [d]efendant to summary judgment on these claims."), the Court will briefly address whether Byrd has shown that he was constructively discharged.

"'Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job.'" Matias v. Sears Home Improvement Prods., Inc., 391 F. App'x 782, 788 (11th Cir. 2010) (per curiam) (unpublished) (quoting Bryant v. Jones, 575 F.3d 1281, 1298 (11th Cir. 2009)). "To prove a constructive discharge, the [p]laintiff must show that the employer imposes working conditions that are so intolerable that a reasonable person in [the employee's] position would have been compelled to resign." Berard v. Wal-Mart Stores E., L.P., No. 8:10–cv–2221–T–26MAP, 2011 WL 4632062, at *3 (M.D. Fla. Oct. 4, 2011) (second alteration in original) (citation and

internal marks omitted); see also Rowell v. Bellsouth Corp., 433 F.3d 794, 802 (11th Cir. 2005); Brantley v. City of Macon, 390 F. Supp. 2d 1314, 1328 (M.D. Ga. 2005) (citation omitted).   "In the Eleventh Circuit, the threshold for establishing constructive discharge 'is quite high.'"   Ross v. City of Perry, No. 5:07-CV-433 (CAR), 2009 WL 3190450, at *9 (M.D. Ga. Sept. 30, 2009) (quoting Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1231 (11th Cir. 2001) (per curiam)), aff'd, 396 F. App'x 668 (11th Cir. 2010) (per curiam) (unpublished).

The employee's subjective feelings about his employer's actions do not matter.  Brantley, 390 F. Supp. 2d at 1328; see also Doe, 145 F.3d at 1450 (citations omitted) (citing Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311, 1317 (11th Cir. 1989)).  "'[M]ere suspicion on an unsubstantiated plot [to terminate an employee] is not an intolerable employment condition.'"   Bean v. Qualis Corp., No. 3:09cv429MCR/EMT, 2011 WL 691614, at *8 n.23 (N.D. Fla. Feb. 17, 2011) (alterations in original) (quoting Fitz v. Pugmire Lincoln-Mercury, Inc., 348 F.3d 974, 978 (11th Cir. 2003)).   In fact, "[p]art of an employee's obligation to be reasonable is an obligation not to assume the worse, and not to jump to conclusions too fast."  Poole v. City of Plantation, No. 05-61698-CIV, 2010 WL 4063728, at *7 (S.D. Fla. Oct. 14, 2010) (citation and internal marks omitted).  As one court put it:

> Every job has its frustrations, challenges and disappointments; these inhere in the nature of work. An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced

by his co-workers.  He is not, however, guaranteed a working environment free of stress.

Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985).

In this case, the Court finds that Byrd's working conditions were not so intolerable as to justify his resignation.  Byrd admits that no one asked him to resign, and he also admits that Gomez reiterated to him that he was a valuable employee who he still needed on the team.  [Doc. 44 at 163].  And, as GCSD points out, Byrd's "contentions that the [L]etter of [D]irection and the findings of the investigation, along with [] Gomez's rescissions of [at least] two of his decisions, removed his leadership authority are insufficient to support a constructive discharge," particularly since Byrd "resigned two days after receiving the [L]etter of [D]irection," even though Gomez, his supervisor, "was adamant that nothing about [ Byrd's] position would change[.]"  [Doc. 49-1 at 8-9 (citations omitted)]. Simply put, the conditions of Byrd's employment about which he complains fall short of the standard for establishing that he was constructively discharged. Indeed, "'a feeling of being unfairly criticized[] or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.'" Wojcicki v. Aiken Tech. Coll., C/A No. 1:06–461–MBS–PJG, 2011 WL 4549207, at *3 n.4 (D.S.C. June 16, 2011) (quoting Heiko v. Colombo Sav. Bank, 434 F.3d 249, 262 (4th Cir. 2006), adopted by 2011 WL 4549198, at *9 (D.S.C. Sept. 30, 2011), aff'd, 501 F. App'x 286 (4th Cir. 2012) (per curiam) (unpublished); see also Williams v.

59

Russell Corp., 218 F. Supp. 2d 1283, 1299 (M.D. Ala. 2002) (citation omitted).[37]

Moreover, Byrd "has a corresponding duty to act responsibly before choosing to

---

[37] Cases in which courts that have allowed constructive discharge claims to proceed past the summary judgment stage present significantly more severe circumstances than Byrd allegedly endured.  See, e.g., Bryant, 575 F.3d at 1299 (plaintiff "introduced shocking evidence of an overt and unabashed pattern of discrimination" in which "[defendant] was abusive to [plaintiff] on numerous occasions, including an interaction where he appeared ready to assault [plaintiff] physically" made "condescending and racially charged comments that [plaintiff] couldn't relate to black men or that she was too ignorant or idealistic to understand racial politics in DeKalb County, [and] it was clear that [plaintiff] was not welcome to continue working for DeKalb County on account of her being white"); Poole v. Country Club of Columbus, Inc., 129 F.3d 551, 552, 553 (11th Cir. 1997) (finding standard met where defendant (1) refused to process plaintiff's worker's compensation claim; (2) transferred her to a new office; (3) stripped her of all responsibility, giving her only a chair and no desk; (4) did not allow her to pack belongings herself; (5) isolated her from conversations with other workers; (6) told her she was as old as his mother; and (7) reduced "her duties and responsibilities . . . to virtually nothing[]").  In fact, the level of harassment alleged here is far less than that alleged in cases where courts have granted summary judgment on a claim of constructive discharge.  See Durley v. APAC, Inc., 236 F.3d 651, 658 (11th Cir. 2000) (finding that constructive discharge standard was not met despite evidence that defendant harassed plaintiff for taking medically necessary leave, increased the harassment after plaintiff filed an EEOC charge, and awarded plaintiff a smaller bonus relative to her co-workers); Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1538-39 (11th Cir. 1987) (plaintiff who voluntarily quit because she felt as though she had been demoted by reassignment, as well as embarrassed and frustrated by being assigned to work under a supervisor she had trained, did not present a claim for constructive discharge "when there was absolutely no evidence of sexual harassment, or, for that matter, of any other kind of harassment"); Freese v. Wuesthoff Health Sys. Inc., No. 6:06-cv-175-Orl-31JGG, 2006 WL 1382111, at *6 (M.D. Fla. May 19, 2006) (allegations of single threatening retaliatory comment; discipline and "harassment," which employee believed was unfair and unwarranted; increased workload; and a failure to respond to her complaints do not establish the existence of an environment so intolerable that a reasonable person would have been forced to resign).

resign and then characterizing that resignation as a constructive discharge." Jackson v. City of Montgomery, Ala. Fire Dep't, Civil Action No. 2:10cv41-MHT, 2010 WL 2403335, at *9 (M.D. Ala. June 9, 2010) (citations omitted), adopted by 2010 WL 2403066, at *1 (M.D. Ala. June 14, 2010).

Viewing all of the facts in the light most favorable to Byrd, he has failed to show circumstances under which a reasonable person would have felt compelled to resign.  See E.E.O.C. v. Family Dollar Stores, Inc., Civil Action File No. 1:06-CV-2569-TWT, 2008 WL 4098723, at *26 (N.D. Ga. Aug. 28, 2008) (citing Hipp, 252 F.3d at 1235) ("The mere fact that a working environment becomes less attractive to the employee does not make the environment objectively intolerable."), adopted at *1. In sum, Byrd "has put nothing into the record that would give rise to a claim for constructive discharge," and "[a]s such, it appears [Byrd] did not suffer an adverse employment action."  Walker v. Putnam Cnty., No. 5:08-CV-00452 (CAR), 2010 WL 3732111, at *9 (M.D. Ga. Sept. 14, 2010).  Because Byrd has failed to establish that he suffered an adverse employment action, he cannot establish a prima facie case of race or color discrimination, and summary judgment in favor of GCSD would be warranted on these claims on this basis alone.  See Turlington v. Atlanta Gas Light Co., 135 F.3d 1428, 1433 (11th Cir. 1998) (explaining that "summary

judgment against the plaintiff is appropriate if [plaintiff] fails to satisfy any one of the elements of a *prima facie* case").[38]

### 2.    *Legitimate Non-Discriminatory Reasons & Pretext*

Even if Byrd could establish a prima facie case, GCSD also contends that it is entitled to summary judgment because it has offered legitimate, non-discriminatory reasons for conducting an internal investigation following four separate complaints by Byrd's subordinate employees and issuing the Letter of Direction following an investigation, which Byrd has failed to show were pretextual.  [Doc. 49-1 at 12-14].  In particular, GCSD asserts four subordinate employees raised complaints about Byrd's alleged unfair and retaliatory treatment, prompting an internal investigation, which subsequently led to the issuance of a Letter of Direction.  [Id. at 13 (citations omitted].  Because GCSD has offered a "'clear and reasonably specific'" non-discriminatory explanation for its decision to initiate an internal investigation into Byrd's actions and to issue him a Letter of Direction following the conclusion of the investigation, see Vessels, 408 F.3d at 770 (citation omitted), it has discharged its burden of production, and the

---

[38] Although Byrd has offered GCSD's treatment of other individuals in an effort to show that GCSD "engaged in a pattern and practice of holding African American directors and managers to less favorable terms, privileges, and conditions of employment than their Caucasian counterparts," and thus argues that he "has presented a prima facie case of discrimination," [Doc. 52 at 25-27], the Court need not address this element of a prima facie case since Byrd has failed to show that he suffered a materially adverse employment action.

burden shifts back to Byrd to prove by a preponderance of the evidence that the reason provided by GCSD was a pretext for a prohibited, discriminatory motive, see Edmond v. Univ. of Miami, 441 F. App'x 721, 724 (11th Cir. 2011) (per curiam) (unpublished); Tiggs-Vaughn v. Tuscaloosa Hous. Auth., 385 F. App'x 919, 923 (11th Cir. 2010) (per curiam) (unpublished).

To demonstrate pretext, Byrd's evidence must reveal "'such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [ GCSD's] proffered legitimate reason[] for its action[] that a reasonable factfinder could find [it] unworthy of credence.'" Maples v. UHS of Ga., Inc., 716 F. Supp. 2d 1266, 1274 (N.D. Ga. 2010) (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997)); see also Vaughn v. FedEx Freight, Inc., 824 F. App'x 797, 803 (11th Cir. 2020) (per curiam) (unpublished) (citation omitted). Byrd may prove pretext by "either proving that intentional discrimination motivated [ GCSD] or producing sufficient evidence to allow a rational trier of fact to disbelieve the legitimate reason proffered by [ GCSD], which permits, but does not compel, the trier of fact to find illegal discrimination." Kilgore v. Trussville Dev., LLC, 646 F. App'x 765, 773 (11th Cir. 2016) (per curiam) (unpublished) (citations and internal marks omitted); see also Hamer v. City of Atlanta, CIVIL ACTION NO. 1:15-cv-00636-ELR-RGV, 2016 WL 10591434, at *14 (N.D. Ga. Dec. 27, 2016) (citations omitted), adopted by 2017 WL 5639953, at *1 (N.D. Ga. Jan. 18, 2017). Byrd may thus create

an issue of fact at the pretext stage by (1) presenting evidence that GCSD's proffered reason is not worthy of belief, or (2) presenting evidence that discrimination was, in fact, GCSD's real reason. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146-47 (2000); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993).

"Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action." Tolley v. United Parcel Serv., No. Civ.A.1:05CV606TWT, 2006 WL 486523, at *5 (N.D. Ga. Feb. 27, 2006) (citation and internal marks omitted); see also Gladden v. Proctor & Gamble Distrib. LLC, CIVIL ACTION NO. 1:19-CV-2938-CAP-JSA, 2021 WL 4929913, at *7 (N.D. Ga. Sept. 8, 2021) (citation omitted), aff'd sub nom. Gladden v. Proctor & Gamble Co., No. 21-13535, 2022 WL 2974066 (11th Cir. July 27, 2022) (per curiam). "Thus, the inquiry is limited to whether [ GCSD] offered an honest, non[-]discriminatory explanation for [the alleged adverse actions], regardless of whether the decision might have been mistaken." Simpson v. Chamberlain Univ. LLC, CIVIL CASE NO. 1:19-cv-01261-SCJ-RGV, 2020 WL 10224094, at *20 (N.D. Ga. Nov. 30, 2020) (second alteration in original) (citation and internal marks omitted), adopted by 2021 WL 2652333, at *2 (N.D. Ga. Mar. 9, 2021). "Ultimately, [ Byrd] must meet [ GCSD's] stated reason 'head on and rebut it, and [he] cannot succeed by simply quarreling with the wisdom of [the] reason.'" Young, 432 F.

App'x at 917 (citation omitted).  Byrd "cannot establish pretext by simply demonstrating facts that suggest [discriminatory] animus, but must specifically respond to . . . [GCSD's] explanation[] and rebut [it]."  Burgos-Stefanelli v. Sec'y, U.S. Dep't of Homeland Sec., 410 F. App'x 243, 247 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted); see also Dibauda, 2019 WL 8376269, at *13 (citation omitted).  "If [ Byrd] fails to demonstrate that there is a genuine issue of material fact concerning whether [ GCSD's] articulated reasons for the adverse employment action[s] are pretextual, then [ GCSD] is entitled to summary judgment on the [discrimination] claim."  Johnson v. Advertiser Co., 778 F. Supp. 2d 1270, 1277 (M.D. Ala. 2011) (citing Combs, 106 F.3d at 1528); see also Dibauda, 2019 WL 8376269, at *13 (citation omitted).

In an effort to prove pretext, Byrd argues that "the investigation which [ he] was subjected to under the direction of [] Batiste was an investigation which violated [ GCSD's] policies and procedures."  [Doc. 52 at 24 (citations omitted)].  In particular, Byrd maintains that GCSD's "policy specifically forbids an investigation of a supervisor based upon an employee's complaint concerning his or her performance evaluation, and [GCSD's ] policy further forbids conducting an internal investigation regarding matters which occurred more than ten [] days prior to the date of the complaint[.]"  [Id. at 25 (citations omitted)].  He asserts that "[d]espite this prohibition, [] Batiste directed an investigation of [ him] based upon

employees' dissatisfaction with their performance evaluation, and based upon some incidents which occurred more than ten [] days prior to such complaints, and [she] accepted the internal complaint of such subordinate employees . . . and concluded the investigation by issuing a decision that [ he] must change such employees' performance evaluations and change his supervision and management of such subordinate employees[.]"  Id. (citation omitted)].  However, Byrd's arguments in this regard are unavailing.

Contrary to Byrd's contention, Batiste testified that while GCSD Policy GAE provides that the "performance ratings contained in personnel evaluations and professional development plans . . . and job performance shall not be subject to complaint . . . . under the provisions of [the] policy," it was understood that it meant that an employee could not "grieve the results of a performance evaluation," but that an employee could "grieve if a process was not fairly followed."  [Doc. 44-5 at 1-2; Doc. 47 at 205-06 pp. 204-05].  She also clarified that while the policy also provides that "[i]n no instance shall there be more than ten [] calendar days between the most recent alleged act about which a complaint may be filed and the first written notice of complaint is received," when a complaint involves sexual harassment or retaliation, for example, the ten-day window did

not apply, [Doc. 44-5 at 2; Doc. 47 at 206-07 pp. 205-06].[39]   As GCSD points out,

Byrd does not deny that four subordinate employees raised complaints about him,

nor does he deny that he was issued a Letter of Direction that provided "a

reasonable directive," even though he disputes that there was a legitimate basis

for the findings as to his actions.   [Doc. 49-1 at 12-13 (citing [Doc. 44 at 97-99, 152,

204-05, 210-11; Doc. 44-24])].   Instead, Byrd contends that no investigation should

---

[39] In any event, Larkins, Oliver, and Brown all filed their complaints within ten
calendar days, and Maharaj filed his complaint fifteen calendar days after he
received his evaluation.   [Doc. 44 at 152; Doc. 48 at 33 p. 32, 36 p. 35; Doc. 49-9 ¶
11; Doc. 49-10 ¶ 13; Doc. 49-11 ¶ 10].   Moreover, GCSD contends that the
"employees filed internal complaints with the Department of Internal Resolution
and Compliance within the HR Division," which "provides an opportunity for
aggrieved employees to resolve grievances involving allegations of unfair
treatment that do not fall under a protected status."   [Doc. 56 at 5-6 (footnote and
citation omitted)].   Indeed, each of the employees complained that they were
experiencing retaliation and unfair treatment based on a series of events that led
to their allegations that Byrd took retaliatory action with respect to their final
performance evaluations, see [Doc. 47-10; Doc. 47-11; Doc. 47-12; Doc. 47-14; Doc.
47-15; Doc. 47-16; Doc. 48-3; Doc. 49-9 ¶¶ 10-11; Doc. 49-10 ¶¶ 12-13; Doc. 49-11 ¶¶
9-10], and the GCSD Personnel Handbook specifically provides that the
Department of Internal Resolution and Compliance, Title IX "investigates
employee, student, and community complaints of discrimination or harassment"
and explains that the procedure for complaints would not apply to performance
ratings contained in personnel evaluations "[u]nless the complaint is based on
unlawful discrimination," [Doc. 47-1 at 18, 24 (emphasis added)].   Byrd argues that
GCSD's "explanation that such complaints are allowed if the allegation is
retaliation is belied by the testimony of [] Batiste that no retaliation was found in
3 of the 4 complaints, and that in the fourth complaint involving [] Larkins[,] no
finding was made that Larkins participated in any protected activity," [Doc. 52 at
22 (citation omitted)], but his argument in this respect is without merit as Batiste
specifically testified that the focus is on the allegations made by the employees,
which in this case included complaints of retaliation and unfair treatment, not the
outcome of the investigation, see [Doc. 47 at 205-07 pp. 204-06].

have occurred and then appears to disagree with the results of the investigation. See [Doc. 52 at 24-25]. Even if GCSD somehow violated its own policies by conducting an internal investigation into Byrd's subordinate employees' complaints connected with their final performance evaluations, the "evidence does not show that [Byrd's] race [or color] motivated [the decision]," and it certainly "does not permit a reasonable inference that the decision . . . was motivated, even in part, by [his] race [or color]." Barnes, 2020 WL 6806823, at *21. Byrd "bears the burden of establishing that [ GCSD's] reasons are a pretext for discrimination" by presenting "significantly probative evidence on the issue to avoid summary judgment," not the other way around, and he has simply failed to do so. Bernstein v. Ga. Dep't of Educ., 970 F. Supp. 2d 1340, 1360 (N.D. Ga. 2013) (citation and internal marks omitted). Indeed, "deviation from a company policy does not demonstrate discriminatory animus." Marshall v. Dentfirst, P.C., 1:14-cv-2421-WSD, 2016 WL 4396125, at *9 n.13 (N.D. Ga. Aug. 18, 2016) (citations and internal marks omitted). That is, the "mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decision were pretextual." Id. (citation and internal marks omitted). In short, "[d]espite [Byrd's] allegations of . . . the purported policy violations, []he has not shown that [GCSD] did not honestly

believe, applying its own business judgment, that it had legitimate grounds to [investigate his subordinate employees' complaints and issue a Letter of Direction] or that [race or color] discrimination was the true reason." Ceranek v. United Airlines, Inc., Case No: 8:20-cv-2292-CEH-SPF, 2022 WL 4305614, at *19 (M.D. Fla. Sept. 19, 2022).[40]

Byrd's "burden . . . is not to show that [GCSD's] reasons for [the alleged adverse employment actions were] ill-founded, but rather that unlawful

---

[40] To the extent Byrd relies on "me too" evidence to prove discriminatory intent, see [Doc. 52 at 25-27], "[s]imilar to comparator evidence proffered as part of a prima facie case, the question of whether 'me too' evidence is relevant to a [p]laintiff's claims depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case," and here, "there is no evidence that [Byrd's] circumstances were comparable to [VJ, who he identifies as a Caucasian employee subjected to an investigation that did not lead to any disciplinary action]," Spivey v. Royston LLC, CIVIL ACTION FILE NO. 1:17-cv-03044-AJB, 2020 WL 13111125, at *12 (N.D. Ga. Apr. 1, 2020). In fact, Byrd's argument shows that Batiste subjected both Caucasian and African American employees to an internal investigation upon receipt of employee complaints, see [Doc. 52 at 25-26], and while he contends that the Caucasian employee "was not subjected to the same scrutiny in the workplace," [id. at 26], the circumstances surrounding "VJ," who was accused anonymously of engaging in inappropriate personal behavior during work hours, demonstrates that his situation was not "closely related . . . to [ Byrd's] circumstances," Spivey, 2020 WL 13111125, at *12; see also [Doc. 52-6]. Furthermore, "even were the evidence [Byrd] offers relevant, when offered to show pretext rather than a prima facie case, me, too evidence is suspect, and generally, courts are reluctant to consider prior bad acts in this employment discrimination context where those acts do not relate directly to the plaintiff." Tyler v. Kia Motors Mfg. Ga., Inc., Civil Action No. 3:14–cv–00147–TCB–RGV, 2016 WL 9663168, at *24 n.55 (N.D. Ga. Aug. 1, 2016) (alteration, citation, and internal marks omitted), adopted by 2016 WL 9651774, at *3 (N.D. Ga. Sept. 1, 2016), aff'd, 702 F. App'x 945 (11th Cir. 2017) (per curiam) (unpublished). Thus, Byrd's argument in this respect is without merit.

discrimination was the motivating factor." Ketchup v. Savannah-Chatham Cnty. Pub. Sch. Sys., CV 414-281, 2016 WL 5402752, at *6 (S.D. Ga. Sept. 26, 2016) (citations omitted).  It is understandable that Byrd disputes the fairness of the decision, but the Court cannot second-guess the fairness or wisdom of the employment decision.  "To discredit [ GCSD's] proffered reason . . . [ Byrd] cannot simply show that [ GCSD's] decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated [ GCSD], not whether [ GCSD] is wise, shrewd, prudent, or competent." Kim-Foraker v. Allstate Ins. Co., 834 F. Supp. 2d 267, 281 (E.D. Pa. 2011) (second alteration in original) (citation and internal marks omitted); see also Baker v. Russell Corp., No. 3:07-CV-1127-WKW[WO], 2009 WL 1357242, at *6 (M.D. Ala. May 6, 2009) (citation omitted), aff'd, 372 F. App'x 917 (11th Cir. 2010) (per curiam) (unpublished).  In fact, Byrd "may disagree with [ GCSD's] decision . . .; however, []he has not presented any evidence from which the Court could conclude that [ GCSD] acted with a discriminatory motive because of [its] business judgment." Maitland v. Employease, Inc., No. Civ.A. 1:05-CV-0661-, 2006 WL 3090120, at *13 (N.D. Ga. Oct. 13, 2006) (citation omitted), adopted at *1.

"Since [GCSD has ] proffered evidence supporting a legitimate, non[-]discriminatory reason for [the alleged employment actions] . . ., and [Byrd] has not come forward with any evidence to show that this reason is pretextual,

summary judgment is warranted." Holifield v. Reno, 115 F.3d 1555, 1565-66 (11th Cir. 1997) (per curiam) (citations omitted), abrogated on other grounds by Lewis v. City of Union City, 918 F.3d 1213 (11th Cir. 2019); see also Boone v. City of McDonough, No. 1:12–cv–1036–WSD, 2013 WL 4670480, at *25 (N.D. Ga. Aug. 29, 2013) (alteration and citation omitted) ("'If the plaintiff fails to demonstrate that there is a genuine issue of material fact concerning whether the employer's articulated reasons for the adverse employment action are pretextual, then the employer is entitled to summary judgment on the discrimination . . . claim.'"), adopted at *5, aff'd, 571 F. App'x 746 (11th Cir. 2014) (per curiam) (unpublished). In sum, Byrd has failed to "produce[] any evidence, outside of his own conclusory say-so, that would support an inference of racial discrimination from the circumstances," Flowers v. Troup Cnty., Ga., Sch. Dist., 803 F.3d 1327, 1337 (11th Cir. 2015) (citation and internal marks omitted), and "[b]ecause [Byrd] has the burden of persuasion . . ., it is his responsibility to advance sufficient evidence of racial discrimination to create a triable factual dispute," id. at 1338, but he has failed to do so. Accordingly, it is **RECOMMENDED** that GCSD's motion for summary judgment on Byrd's Title VII and § 1981 race discrimination claims and Title VII color discrimination claim asserted in Counts I, II, and IV of his amended complaint be **GRANTED**.

**B.    Retaliation Claim**

Byrd also asserts a Title VII claim of retaliation,[41] alleging that after he reported L.M.'s allegations of sexual harassment by Brown, he was subjected to an internal investigation of complaints made by four of his subordinate employees and issued a Letter of Direction, which led to his resignation.  See [Doc. 52 at 7-23]. GCSD moves for summary judgment on this claim, arguing that Byrd cannot establish a prima facie case of retaliation,[42] because, even assuming he engaged in

---

[41] As previously noted, it is unclear whether Byrd intended to assert a retaliation claim under § 1981, however, since "Title VII and § 1981 use the same analysis for . . . retaliation claims," Johnson v. Gwinnett Cnty. Sch. Dist., Civil Action No. 1:11–CV–00471–TWT–RGV, 2012 WL 5987584, at *9 (N.D. Ga. Oct. 17, 2012) (citations omitted), adopted by 2012 WL 5987581, at *1 (N.D. Ga. Nov. 28, 2012), the following analysis under Title VII equally applies to Byrd's retaliation claim under § 1981, to the extent he even asserts such a claim.

[42] To establish a prima facie case of retaliation, Byrd must demonstrate that (1) he engaged in statutorily protected activity; (2) he suffered a materially adverse action; and (3) there is a causal connection between the protected activity and the adverse action.  Stinson v. Pub. Serv. Tel. Co., 486 F. App'x 8, 10 (11th Cir. 2012) (per curiam) (unpublished) (citing Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008)).  "Additionally, at summary judgment [ Byrd] must prove that 'the desire to retaliate was the but-for cause of the challenged employment action.'"  Dixon v. DTA Sec. Servs., No. 20-12040, 2021 WL 5320987, at *4 (11th Cir. Nov. 16, 2021) (per curiam) (citation omitted) (quoting Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 352 (2013)).  The "but-for causation is established whenever a particular outcome would not have happened 'but for' the purported cause," and this test "directs [the Court] to change one things at a time and see if the outcome changes." Lapham, 88 F.4th at 894 (citation and internal marks omitted).  "For purposes of McDonnell Douglas, this but-for standard demarcates the causation component of the employee's initial, prima facie showing requirement and also shapes the subsequent burdens of both the employer . . . and the employee[.]"  Id.

statutorily protected activity, he cannot establish that he suffered a materially adverse employment action and because he cannot show that his raising of L.M.'s harassment complaint was the cause of his receipt of the Letter of Direction. [Doc. 49-1 at 17-18]. GCSD further argues that Byrd has failed to show that its legitimate, non-retaliatory reasons for its employment decisions were pretext for retaliation. [Id.]; see also [Doc. 56 at 9-10]. The Court will address each of these arguments.

1.   *Prima Facie Case*

GCSD first contends that it is entitled to summary judgment because Byrd "did not suffer a 'materially adverse' action," pointing out that a Letter of Direction "is not a materially adverse action." [Doc. 49-1 at 17]. For the following reasons, as well as the reasons discussed with regard to Byrd's discrimination claims, the Court agrees that Byrd has failed to show he suffered a materially adverse employment action.

The "Supreme Court has held that the anti-retaliation provision of Title VII covers a broader scope of conduct than does the anti-discrimination provision." Holmes v. City of Atlanta, Civil Action No. 1:08–CV–3560–JOF–CCH, 2010 WL 1328713, at *13 (N.D. Ga. Jan. 27, 2010) (citation omitted), adopted as modified by 2010 WL 1328733, at *3 (N.D. Ga. Mar. 30, 2010). Therefore, an employee claiming retaliation need not show an adverse action that actually affected the terms and conditions of his employment. Crosby v. Mobile Cnty. Pers. Bd., No. 05-17039,

2007 WL 245126, at *4 (11th Cir. Jan. 30, 2007) (per curiam) (unpublished); Arnold v. Tuskegee Univ., 212 F. App'x 803, 810 n.4 (11th Cir. 2006) (per curiam) (unpublished).  Instead, Byrd must show that he suffered an action which a reasonable employee would find "materially adverse," that is, an action harmful to the point that it "could well dissuade a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co., 548 U.S. at 57.  That is, "[a] challenged action must do more than merely affront a 'plaintiff's unusual subjective feelings' and cannot be a trivial harm that offends 'a general civility code for the American workplace.'" Manns v. City of Atlanta, Civil Action File No. 1:06-CV-0609-TWT, 2008 WL 150699, at *8 (N.D. Ga. Jan. 11, 2008) (quoting Burlington N. & Santa Fe Ry. Co., 548 U.S. at 68).  And, "[a]lthough Title VII's protection against retaliatory discrimination extends to adverse actions which fall short of ultimate employment decisions, the plaintiff must still demonstrate some threshold level of substantiality." Wesolowski v. Napolitano, 2 F. Supp. 3d 1318, 1348 (S.D. Ga. 2014) (citation and internal marks omitted).  To determine whether an action is materially adverse, the Court considers the particular circumstances of the case. Burlington N. & Santa Fe Ry. Co., 548 U.S. at 69.  As the Supreme Court has instructed, context matters. Id.

Byrd maintains that there "can be no dispute that an employer's failure to allow a supervisor to protect an employee from sexual harassment in the

workplace, or to investigate sexual harassment in the workplace by his subordinate employees, or even to attempt to do so, may be considered an adverse employment practice, nor can it be disputed that removing or diminishing a supervisor's authority to supervise subordinate employees may be considered an adverse employment action," since these acts "would discourage any person from participating in or opposing a charge of discrimination[.]"   [Doc. 52 at 20-21 (citation omitted)].   First, the Court fails to see how Batiste's explanation during her discussion with Byrd on July 12, 2021, that it was HR's job to investigate employee complaints since they were trained on the proper procedures and protocol in handling such complaints and that it was his job to report those complaints that were brought to his attention but not to take on the investigation constitutes an adverse employment action to support his retaliation claim, particularly since the meeting that occurred on that day did not result in any sort of disciplinary action as a result of Byrd's actions in personally undertaking the responsibility to investigate L.M.'s complaint of harassment.  See [Doc. 52-10 at 4-29]; see also [Doc. 44 at 136].  Indeed, GCSD's "act of meeting with [Byrd] and discussing the matter is not an adverse employment action as a matter of law," Williams v. KS Mgmt. Servs., LLC, Civil Action No. 4:18-3800, 2020 WL 2736571, at *7 (S.D. Tex. May 26, 2020) (citations omitted), nor is GCSD's directive that Byrd stop performing work which was outside the scope of his job as the ISC Facility

Manager but fell under HR's responsibility, see [Doc. 44 at 18, 20, 49-50; Doc. 44-2; Doc. 44-5; Doc. 47-1; Doc. 52-10 at 4-29].  Byrd has simply "offered no evidence [the July 12, 2021, meeting during which he was informed that it was not his job to investigate L.M.'s complaint] led to some more tangible adverse action or effect, nor any explanation as to how it would have dissuaded a reasonable employee from engaging in protected activity."  Aburaad v. Haines City, Case No: 8:19-cv-2305-TPB-AAS, 2022 WL 861578, at *5 (M.D. Fla. Mar. 23, 2022) (citation omitted).

Moreover, contrary to Byrd's assertion, the investigation into his subordinate employees' complaints, which led to the rescission of some of his employment decisions, in no way diminished his supervisory authority or impacted his position as ISC Facility Manager.[43]  In fact, Byrd testified that Gomez emphasized that he remained a supervisor and "leader of the department" and that he would still be performing his job, [Doc. 44 at 213], and the evidence also shows that Gomez met with Larkins, Maharaj, Oliver, and Brown to reiterate that Byrd was their supervisor, that nothing had changed, and that Byrd would

---

[43] As previously discussed, the "concept that the opening [of] an investigation into conduct is itself retaliation seems belied by the wealth of case law holding that the placement of an employee on administrative leave pending an internal investigation is not an adverse employment action," since "[i]f placing an employee on leave pending investigation is not necessarily an adverse employment action, then by extension, the simple act of investigating the employee cannot be either."  Joseph v. Bd. of Regents of Univ. Sys. of Ga., Civil Action No. 1:20-cv-00502-VMC, 2023 WL 2393974, at *30 (N.D. Ga. Mar. 3, 2023) (citation omitted).

continue to assign them tasks, [Doc. 49-9 ¶ 12; Doc. 49-10 ¶ 14; Doc. 49-11 ¶ 12]. "The law is clear that purely subjective injuries, such as dissatisfaction with a reassignment, public humiliation, or loss of reputation are not adverse actions." Dudley v. Wash. Metro. Area Transit Auth., 924 F. Supp. 2d 141, 178 (D.D.C. 2013) (citations and internal marks omitted). And, "[w]hile changes in job responsibilities may constitute adverse employment actions," Byrd "fails to show how the [rescission of certain employment decisions] contributed to [a] stripping of [ his] supervisory duties," and in fact, the evidence shows that it did not. Warner v. Vance-Cooks, 956 F. Supp. 2d 129, 173 (D.D.C. 2013) (citation omitted).

Although the internal investigation which led to the rescission of certain decisions did result in the issuance of a Letter of Direction to Byrd, as previously discussed, the Eleventh Circuit has held that written counseling does not constitute a materially adverse employment action where plaintiff "failed to allege that it had any significant impact on his employment," even under the more lenient standard for retaliation claims. Hall, 503 F. App'x at 790; see also Edwards v. Gwinnett Cnty. Sch. Dist., 977 F. Supp. 2d 1322, 1333 (N.D. Ga. 2013) (finding a "letter of redirection" did not constitute a materially adverse action sufficient to support plaintiff's retaliation claim); Reshard v. Lahood, Civil Action No. 87–2794 (RBW), 2010 WL 1379806, at *17 (D.D.C. Apr. 7, 2010) (finding "plaintiff [could not] establish[] a retaliation claim based on the defendant's issuance of the letter of

[reprimand]," even though the letter was to be included in plaintiff's personnel file for up to three years), aff'd, 443 F. App'x 568 (D.C. Cir. 2011) (unpublished); Cochise v. Salazar, 601 F. Supp. 2d 196, 201 (D.D.C. 2009) (footnote and citations omitted) (finding that "[n]either letters of counseling that contain job-related constructive criticism . . ., nor warnings without attendant effects on employment, . . . are materially adverse employment actions" sufficient to support plaintiff's retaliation claim), aff'd, 377 F. App'x 29 (D.C. Cir. 2010) (per curiam) (unpublished).  Thus, Byrd has not shown he suffered from a materially adverse employment action, and he has therefore failed to establish a prima facie case of retaliation.

To establish a prima facie case, Byrd also must show that "there [was] a causal connection between the protected activity and the adverse employment decision," which he has failed to do.  Morgan v. Orange Cnty., 477 F. App'x 625, 628 (11th Cir. 2012) (per curiam) (unpublished) (alteration in original) (citation and internal marks omitted).  "To establish that causal connection, [] [Byrd] need only show 'that the protected activity and the adverse action were not wholly unrelated.'"  Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1354 (11th Cir. 1999) (quoting Simmons v. Camden Cnty. Bd. of Educ., 757 F.2d 1187, 1189 (11th Cir. 1985) (per curiam)); see also Sprinkle v. City of Douglas, 621 F. Supp. 2d 1327, 1351-52 (S.D. Ga. 2008) (citation omitted).  "In order to show the two things were not

entirely unrelated, [] [Byrd] must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action." Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000) (citations omitted).

GCSD argues that Byrd cannot establish causality because it "initiated its investigation into unfair allegations against [him] before [he] alerted [ GCSD] of sexual harassment claims asserted by a contracted worker." [Doc. 56 at 8-9]; see also [Doc. 49-1 at 17-18].  In particular, GCSD points out that while Byrd "relies on his contention that it was [] his raising a complaint of 'sexual harassment' by a contracted employee which was the but-for cause of his receipt of the [L]etter of [D]irection," his "contention overlooks the following undisputed facts: 1) there were four [] separate complaints raised by his subordinate employees, all of which occurred prior to the alleged sexual harassment allegation; 2) an internal investigation was conducted beginning June 11, 2021 and concluding in August of 2021; 3) the internal investigation resulted in findings of unfair treatment and/or retaliation for actions which [Byrd] does not dispute he took; and 4) [Byrd's L]etter of [D]irection was directly related to the findings of the internal investigation[.]" [Doc. 49-1 at 17-18 (citing [Doc. 44 at 97-99, 152, 187, 200, 202-05; Doc. 44-24; Doc. 47-10; Doc. 47-11; Doc. 47-14; Doc. 48 at 33 p. 32, 36 p. 35; Doc. 49-10 ¶ 13; Doc. 49-11 ¶ 10])].  Thus, GCSD maintains that Byrd "cannot satisfy the causation element

of his retaliation claim." [Doc. 56 at 8]. Byrd has not addressed GCSD's argument in this respect. See generally [Doc. 52]. For the reasons that follow, the Court agrees with GCSD.

The evidence shows that the allegedly retaliatory act about which Byrd complains, *i.e.*, the decision to initiate an investigation into his subordinate employees' complaints which subsequently led to the rescission of certain decisions and the issuance of a Letter of Direction to Byrd, was made before he engaged in any discussions about L.M.'s allegations of sexual harassment by Brown, since the earliest employee complaint about Byrd was received on June 11, 2021, with the remaining complaints also having been received on or prior to June 25, 2021, the date Byrd asserts that he reported the sexual harassment allegations to GCSD. [Doc. 44 at 97-99, 109-10, 112-13, 152, 187, 200, 202-05; Doc. 44-14; Doc. 44-24; Doc. 47 at 93-94 pp. 92-93; Doc. 47-9 at 9-10; Doc. 47-10; Doc. 47-11; Doc. 47-12; Doc. 47-14; Doc. 48 at 33 p. 32, 36 p. 35; Doc. 49-9 ¶ 11; Doc. 49-10 ¶ 13; Doc. 49-11 ¶ 10]. "It is only logical that a plaintiff's protected activity must take place before the alleged retaliatory actions; otherwise, the plaintiff cannot demonstrate a causal link between the protected activity and the alleged retaliation." Perkins v. Lynch, 169 F. Supp. 3d 1246, 1252 (N.D. Ala. 2016) (citation omitted); see also Cheatham v. DeKalb Cnty., 682 F. App'x 881, 887 (11th Cir. 2017) (per curiam) (unpublished) (finding plaintiff failed to establish the third element of a prima

facie case of retaliation–causal link--because the "alleged adverse employment actions . . . occurred before [the] statutorily-protected activities were undertaken"); Rollins v. Ala. Cmty. Coll. Sys., 814 F. Supp. 2d 1250, 1313 (M.D. Ala. 2011) (citing Schechter v. Ga. State Univ., 341 F. App'x 560, 563 (11th Cir. 2009) (per curiam) (unpublished)) (finding "no causal connection where adverse employment action occurred before protected activity").

Byrd has failed to present sufficient evidence to permit a reasonable trier of fact to determine that his protected activity caused the alleged adverse actions. The undisputed evidence shows that the decision to initiate investigations into the subordinate employees' complaints was made prior to Byrd's engaging in protected activity, see [Doc. 44 at 97-99, 109-10, 112-13, 152, 187, 200, 202-05; Doc. 44-14; Doc. 44-24; Doc. 47 at 93-94 pp. 92-93; Doc. 47-9 at 9-10; Doc. 47-10; Doc. 47-11; Doc. 47-12; Doc. 47-14; Doc. 48 at 33 p. 32, 36 p. 35; Doc. 49-9 ¶ 11; Doc. 49-10 ¶ 13; Doc. 49-11 ¶ 10], and the mere fact that the investigation was not concluded and the resulting Letter of Direction was not carried out until after he engaged in protected activity is simply not probative of retaliatory intent in this case, see Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned [employment actions] upon discovering [protected activity], and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."); McMullen v.

Tuskegee Univ., 184 F. Supp. 3d 1316, 1321-22 (M.D. Ala. 2016) (citation and internal marks omitted) (explaining that "[w]hen an employer makes a tentative decision before protected activity occurs, the fact that an employer proceeds with such a decision is not evidence of causation" and finding that "even if the decision to terminate [plaintiff] was not finalized at the time [she] filed her complaint, a belief that following through with that decision was retaliation [was] not . . . objectively reasonable" and that summary judgment was therefore due to be granted on her retaliation claim); Jenkins, 72 F. Supp. 3d at 1261 (citation and internal marks omitted) (finding plaintiff could not "establish a causal relationship," because "[w]hen an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation"); Morales v. Ga. Dep't of Human Res., Civil Action No. 7:08-CV-156 (HL), 2010 WL 4639279, at *13 (M.D. Ga. Nov. 8, 2010) (finding memorandum of concern and written reprimand not done in retaliation for plaintiff's filing of an EEOC charge because those actions were contemplated prior to plaintiff filing the charge), aff'd, 446 F. App'x at 179.[44]   Accordingly,

---

[44] With respect to his GWA retaliation claim, Byrd argues that he raised concerns "that overtime should be provided to employees who worked beyond forty [] hours," a month prior to the initiation of the investigation into his subordinate employees' complaints, [Doc. 52 at 30]; however, Byrd has not cited to any evidence to support his contention that he raised any concerns regarding alleged

summary judgment is due to be granted in favor of GCSD because Byrd cannot
establish a prima facie case of retaliation.

**2.    *Legitimate Non-Retaliatory Reasons & Pretext***

Even if Byrd could establish a prima facie case of retaliation, GCSD has
articulated non-retaliatory reasons for its actions in investigating the complaints
made by four employees against Byrd and issuing him a Letter of Direction, and
Byrd has failed to show pretext.  Because GCSD's reasons constitute legitimate,

---

FLSA violations with Batiste, but rather, the evidence shows that he spoke with
Gomez in May 2021 about his concerns that the FLSA was not being adhered to by
non-exempt department security employees, including Larkins and Maharaj, and
that the schedule needed to change to comply with FLSA by having the employees
work two hours during the weekend and thirty-eight hours during the weekday,
and Byrd communicated this schedule change to GSCD staff, but he has not cited
any evidence to show that Batiste was aware of his concerns at the time the
investigation into the employee complaints began in June 2021, and the meeting
notes reflect that Batiste was not present at the meeting at the time the schedule
change decision was made, [Doc. 52-2 ¶ 61; Doc. 52-3 ¶ 6]; see also [Doc. 46 at 71
p. 70; Doc. 46-7; Doc. 49-10 ¶ 11].  Even if Batiste was aware of the schedule change,
this awareness does not show that she was aware that Byrd attempted to engage
in any protected activity by disclosing FLSA violations, and the Court "declines
[Byrd's] invitation to sift through the record and determine when [he] may have
first engaged in [protected] activity" as "[a] litigant on summary judgment cannot
shift their burden to the court with the expectation that it will unearth any
beneficial evidentiary nuggets[.]"  Johnson v. AutoZone, Inc., 768 F. Supp. 2d 1124,
1154 n.162 (N.D. Ala. 2011) (citations omitted).  Thus, "the [C]ourt will not
squander scarce resources looking through hundreds of pages of evidentiary
submissions for a shred of evidence indicating that [Byrd] engaged in protected
activity at some point prior [to the alleged adverse actions]," and because Byrd
"has failed to direct the [C]ourt to evidence in the record supporting the conclusion
that [the] decisionmaker had knowledge of [his alleged] protected activity," he
"cannot demonstrate a causal connection between the [alleged] protected conduct
and the purported adverse action."  Id. at 1154 n.162, 1156 (citations omitted).

non-retaliatory reasons for the challenged employment actions, which satisfies GCSD's "exceedingly light" burden, the onus is on Byrd to prove by a preponderance of the evidence that GCSD's reasons are pretext for prohibited, retaliatory conduct.  See Vessels, 408 F.3d at 770 (citation and internal marks omitted); Gray v. City of Jacksonville, 492 F. App'x 1, 5 (11th Cir. 2012) (per curiam) (unpublished) (citations omitted).   To establish pretext, Byrd "must present concrete evidence in the form of specific facts which show [ GCSD's] proffered reason[s are] mere pretext." Smith v. Harvey, 421 F. Supp. 2d 1370, 1378 (S.D. Ala. 2006) (citation and internal marks omitted).  Again, Byrd must meet GCSD's reasons "head on and rebut [them]."  Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000) (citations omitted).

Byrd attempts to show pretext with respect to his retaliation claim in the same manner he did with his discrimination claim, see [Doc. 52 at 21-22],[45] and "[f]or the same reasons that this Court rejected [his] attempt[] to establish pretext for th[at] claim[], the Court finds that []he has failed to introduce any evidence from which a jury could infer pretext for [his] retaliation claim," Philson v. Hosp.

---

[45] Byrd argues that he did not violate any "rule in the performance evaluations which he issued to employees," [Doc. 52 at 22-23]; however, "whether or not he committed a [] violation is immaterial, and he has failed to present evidence that [GCSD] did not in fact believe he violated . . . policy," Tompkins v. Montgomery Cnty. Bd. of Educ., 926 F. Supp. 2d 1274, 1285 (M.D. Ala. 2013).

Auth. of Houston Cnty., Civil Action No. 5:08–CV–155 (HL), 2009 WL 2477255, at

*15 (M.D. Ga. Aug. 10, 2009); see also Anderson v. Dunbar Armored, Inc., 678 F.

Supp. 2d 1280, 1316 (N.D. Ga. 2009), adopted at 1290.   Simply put, Byrd has

produced insufficient evidence to create a genuine issue of material fact that

GCSD's reasons for the challenged actions were pretext for retaliation, and he has

failed to meet his ultimate burden of showing that GCSD's "reasons for the

adverse actions were pretext for retaliation and retaliation was the but-for cause

of the adverse action."   Pasqualetti v. Unified Gov't of Athens-Clarke Cnty., CIVIL

ACTION No. 3:13-CV-13 (CAR), 2015 WL 5722798, at *14 (M.D. Ga. Sept. 29, 2015)

(footnote omitted).   Because Byrd has failed to show that GCSD's proffered

reasons are so inconsistent, implausible, incoherent, or contradictory that they are

unworthy of belief, he has failed to create any genuine issue as to pretext, and it is

**RECOMMENDED** that GCSD's summary judgment motion as to Byrd's

retaliation claim be **GRANTED**.[46]

---

[46] To the extent Byrd argues that his claims of discrimination and retaliation could survive summary judgment under the alternative analysis that there is "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker," Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011) (footnote, citations, and internal marks omitted); see also James, 823 F. App'x at 735 (assuming without deciding that the convincing mosaic theory applied to retaliation claims and finding that plaintiff, whose only evidence was her own declaration, had failed to "create a convincing mosaic of circumstantial evidence that created a triable issue about the [defendant's] retaliatory intent"); Vinson v. Macon-Bibb Cnty., CIVIL ACTION NO. 5:18-cv-00306-TES, 2020 WL 2331242, at *12 (M.D. Ga. May 11, 2020) (citations

C.     **State Law Claim**

Byrd asserts a state law claim against GCSD for retaliation under the GWA. [Doc. 15 ¶¶ 59-61].  Byrd's state law claim, however, does not on its face "aris[e] under the Constitution, laws, or treaties of the United States," and therefore is not a sufficient basis for federal question jurisdiction, Bank of N.Y. v. Wilson, Civil Action File No. 1:08-CV-332-TWT, 2008 WL 544741, at *1 (N.D. Ga. Feb. 25, 2008) (quoting 28 U.S.C. § 1331), adopted at *1; see also Caterpillar Inc. v. Williams, 482 U.S. 386, 392 (1987), and Byrd has not alleged diversity jurisdiction under 28 U.S.C.

---

and internal marks omitted) (discussing the convincing mosaic theory and explaining that while plaintiffs explained how the analysis worked, they "never present[ed] the evidentiary tiles to construct the mosaic for [the] . . . claim" and that it was "not the Court's burden to comb through [the] records . . . to develop arguments in a parties' favor when such arguments should have been presented to the Court for consideration," since the "onus [was] upon the parties to formulate arguments" and "district courts cannot concoct or resurrect arguments neither made nor advanced by the parties"), aff'd sub nom. Vinson v. Tedders, 844 F. App'x 211 (11th Cir. 2021) (per curiam) (unpublished); Welker v. Orkin, LLC, Civil Action No. 5:13–CV–126 (MTT), 2014 WL 1572535, at *6 & n.7 (M.D. Ga. Apr. 17, 2014) (acknowledging the alternative analysis of presenting a convincing mosaic of circumstantial evidence under Smith, but noting plaintiff only relied on the McDonnell Douglas framework for circumstantial evidence), for all the reasons discussed herein, the record does not support such an inference.  Furthermore, even if Byrd had "such circumstantial evidence, [his] inability to establish that []he suffered an adverse employment action renders the convincing mosaic irrelevant." Franks, 572 F. Supp. 3d at 1347 (citations omitted) (citing Lackey v. La Petite Acad., Inc., Case No.: 2:18-CV-00429-RDP, 2020 WL 1285828, at *5 (N.D. Ala. Mar. 16, 2020) (stating "plaintiff must establish that she suffered an adverse employment action whether she seeks to prove intentional discrimination through use of direct evidence, application of the McDonnell Douglas framework, or by presenting a convincing mosaic of circumstantial evidence").

§ 1332, see 28 U.S.C. § 1332(a); see also [Doc. 15 ¶ 6], nor could he in this case. Because Byrd has failed to allege any viable federal claim, if the recommendation to dismiss all the federal claims is adopted, it is further **RECOMMENDED** that supplemental jurisdiction not be exercised over the remaining state law claim and that this claim be **DISMISSED WITHOUT PREJUDICE**.  See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988); Scarfo v. Ginsberg, 175 F.3d 957, 962 (11th Cir. 1999); see also Bryant v. Norfolk S. R.R., No. 22-10452, 2022 WL 17420593, at *1 (11th Cir. Dec. 6, 2022) (per curiam) (finding no error where the district court declined to exercise supplemental jurisdiction over the remaining state law claims after granting summary judgment as to the federal claims).  Alternatively, if supplemental jurisdiction is exercised over the remaining state law claim asserted against GCSD, for the reasons that follow, it is **RECOMMENDED** that GCSD's motion for summary judgment be **GRANTED** as to Byrd's state law claim asserted against it.

Byrd alleges that "he was subjected to adverse employment actions in violation of the [GWA] in retaliation for reporting to his supervisor and to [] [ GCSD] . . . that . . . Brown and [] Oliver[] were not complying with the law and [GCSD ] regulations by discriminating against [L.M.]" and that he was "subjected to retaliation by disclosing to his supervisor . . . that [ GCSD] employees should not work beyond a 40 hour work week without being compensated for such hours

beyond 40 hours." [Doc. 52 at 27-28]. GCSD contends that Byrd, whose GWA claim relies "on the same set of facts as his discrimination and retaliation claims," has failed to set forth a prima facie case for retaliation under the GWA, and that even if he could, he has not shown that GCSD's legitimate, non-retaliatory reasons were pretext. [Doc. 49-1 at 19-25]; see also [Doc. 56 at 10-15].

Under the GWA, "[n]o public employer shall retaliate against a public employee for disclosing a violation of or noncompliance with a law, rule, or regulation to either a supervisor or a government agency, unless the disclosure was made with knowledge that the disclosure was false or with reckless disregard for its truth or falsity." O.C.G.A. § 45-1-4(d)(2).[47] To set forth a prima facie case for retaliation under O.C.G.A. § 45-1-4(d)(2), "the employee must present evidence that (1) the employer falls under the statute's definition of public employer; (2) the employee disclosed a violation of or noncompliance with a law, rule, or regulation to either a supervisor or government agency; (3) the employee was then discharged, suspended, demoted, or suffered some other adverse employment decision by the public employer; and (4) there is some causal connection between (2) and (3)." Hogan v. Hosp. Auth. of Valdosta & Lowndes Cnty., Civil Action No.

---

[47] "'Law, rule, or regulation' includes any federal, state, or local statute or ordinance or any rule or regulation adopted according to any federal, state, or local statute or ordinance." O.C.G.A. § 45-1-4(a)(2).

7:15-CV-138 (HL), 2016 WL 3248374, at *5 (M.D. Ga. June 13, 2016) (citation and internal marks omitted).

Here, the Court "presumes that [GCSD] is a public employer for purposes of the GWA" and that Byrd "disclosed a violation of a law, rule, or regulation," but, for the reasons previously discussed with respect to his discrimination and retaliation claims under Title VII and § 1981, he cannot establish that he "suffered [an] adverse employment action and did not suffer a constructive discharge," and he "also cannot show a causal connection between [his] allegedly protected activity and the alleged adverse employment decision[s]." Lamar v. Clayton Cnty. Sch. Dist., CIVIL ACTION FILE NO. 1:13-CV-1600-HLM, 2014 WL 11462829, at *19–20 (N.D. Ga. Oct. 7, 2014) (footnote omitted), aff'd, 605 F. App'x at 804.  Thus, Byrd "cannot establish a prima facie case for [his] claim under the GWA," id., at *20, and he also has failed to show a genuine issue of pretext as to GCSD's legitimate, non-retaliatory reasons for the alleged adverse actions, and summary judgment is therefore due to be granted on his GWA retaliation claim,[48] see Dimino v. Ga. Dep't of Admin. Servs., CIVIL ACTION FILE NO. 1:13-CV-00195-

---

[48] With respect to the GWA claim, the Court notes that "Georgia law requires [Byrd] to satisfy the *McDonnell Douglas* framework," and Byrd has cited "no authority stating that a claim under the [GWA] can be evaluated under a 'convincing mosaic' of circumstantial evidence or any other alternative framework."  Swint v. City of Carrollton, 859 F. App'x 395, 400-01 (11th Cir. 2021) (per curiam) (unpublished) (citation omitted).

ODE-RGV, 2014 WL 11444088, at *20 (N.D. Ga. Nov. 26, 2014) (citations omitted) (finding plaintiff's GWA retaliation claim failed as a matter of law because she failed to rebut defendant's legitimate, non-retaliatory reasons for her termination), adopted by 2015 WL 11018406, at *14 (N.D. Ga. Mar. 24, 2015), aff'd, 631 F. App'x 745 (11th Cir. 2015) (per curiam) (unpublished); Schultz v. City of Hapeville, CIVIL ACTION NO. 1:08-cv-3222-WSD-RGV, 2010 WL 11493296, at *12 (N.D. Ga. Jan. 15, 2010) (citations omitted) (recommending summary judgment in favor of defendant on plaintiff's retaliation claim where defendant articulated legitimate, non-retaliatory reasons for the adverse employment actions, which plaintiff failed to address, and, "as a result, [plaintiff ] failed to establish that they were pretextual"), adopted by 2010 WL 11493295, at *3 (N.D. Ga. Feb. 9, 2010).

## III.    CONCLUSION

For the foregoing reasons, Byrd's motion for leave to file a surreply, [Doc. 58], is **GRANTED** and the Clerk is **DIRECTED** to enter Byrd's surreply, [Doc. 58-1], on the docket, and it is **RECOMMENDED** that GCSD's motion for summary judgment, [Doc. 49], be **GRANTED**.

The Clerk is **DIRECTED** to terminate this reference.

**IT IS SO ORDERED**, **RECOMMENDED**, and **DIRECTED** this 7th day of February, 2024.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE