## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

RICHARD L. BYRD,

    Plaintiff,

            v.

GWINNETT COUNTY SCHOOL DISTRICT,

    Defendant.

Civil Action No.
1:22-cv-01457-SDG

## OPINION AND ORDER

This matter is before the Court on the Final Report and Recommendation (R&R) of United States Magistrate Judge Russell G. Vineyard [ECF 63], granting summary judgment to Defendant Gwinnett County School District (the District) on all of Plaintiff Richard Byrd's claims. For the following reasons, the R&R is **ADOPTED IN PART** and **DECLINED IN PART**. The District's motion for summary judgment [ECF 49] is **DENIED** as to Byrd's Title VII retaliation claim, and **GRANTED** as to his remaining claims.

## I.    BACKGROUND

This is an employment suit brought by Byrd against the District, for which he worked as a facilities manager for 15 years, about the circumstances surrounding his resignation from his position in September 2021.[1] Byrd's case centers around certain actions allegedly taken by his supervisors at the District—

---

[1]    ECF 52-2, at 1 ¶ 1.

1

threatening him, overruling various of his supervisory decisions, issuing him a written reprimand[2]—shortly after Byrd raised concerns about sexual harassment allegations involving one of Byrd's subordinates.[3] Byrd alleges that the District illegally retaliated against him in violation of Title VII of the Civil Rights Act of 1964 and the Georgia Whistleblower Act, O.C.G.A. § 45-1-4(3), for reporting workplace sex discrimination.[4] Byrd—who is black[5]—additionally brings race and color discrimination claims under Title VII (both race and color)[6] and 42 U.S.C. § 1981 (race only).[7] The District moved for summary judgment on all of Byrd's claims, arguing that Byrd did not suffer an adverse employment action and that, even if he did, he did not suffer it because of his sex-discrimination reporting, race, or color.[8] The R&R, agreeing with the District, recommends that the District be granted summary judgment on all counts.[9] Byrd timely filed objections disputing the grant of summary judgment on each of his claims.[10]

---

[2]  *See infra* notes 23–33.

[3]  ECF 52-2, at 7 ¶ 24.

[4]  ECF 15, at 17–18.

[5]  ECF 52-2, at 1 ¶ 1.

[6]  ECF 15, at 16.

[7]  *Id.* at 17.

[8]  *See generally* ECF 49.

[9]  *See generally* ECF 63.

[10]  *See generally* ECF 66.

## II.     STANDARD OF REVIEW

In reviewing an R&R to which objections have been filed, a district court must review the objected-to parts of the R&R *de novo*, 28 U.S.C. § 636(b)(1), provided the objecting party "clearly advise[s] the district court and pinpoint[s] the specific findings that the party disagrees with." *United States v. Schultz*, 565 F.3d 1353, 1361 (11th Cir. 2009). Where the objections are "not specific enough or clear enough to permit the district court to effectively review the magistrate judge's ruling," *Schultz*, 565 F.3d at 1360, the district court must ensure only that the R&R is not "clearly erroneous or … contrary to law," Fed. R. Civ. P. 72(b). A district court may, in its discretion, consider or decline to consider arguments that were never presented to the magistrate judge. *Williams v. McNeil*, 557 F.3d 1287, 1290–92 (11th Cir. 2009). It may otherwise "accept, reject, or modify, in whole or in part," the R&R's factual determinations and legal recommendations under its broad discretion. 28 U.S.C. § 636(b)(1).

## III.    DISCUSSION

The parties dispute whether the R&R properly concluded that the District is entitled to summary judgment under Fed. R. Civ. P. 56 on all of Byrd's claims. Summary judgment is appropriate when "there is no genuine dispute as to any material fact," Fed. R. Civ. P. 56(a); a fact is "material" if it could change the outcome of the case, and a dispute is "genuine" if a reasonable jury could resolve

it in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The purpose of summary judgment is to test "the need for a trial"—to look for "factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250. Thus, at summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. Judges are not to weigh evidence, determine credibility, or draw their own inferences from the facts, these being the proper functions of the jury. *Id.*

Procedurally, the party seeking summary judgment must identify both the basis for its motion and those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party opposing summary judgment must then show either that a genuine issue of material fact exists, or that the movant is not entitled to judgment as a matter of law. *Id.* at 324.

Here, the District argued—and the R&R concluded—that the District was entitled to summary judgment on each of Byrd's claims because no triable factual dispute existed as to whether Byrd (1) had suffered an adverse employment action, and (2) had otherwise satisfied the *McDonell Douglas* burden-shifting framework. In response, Byrd filed disorganized objections that commingle factual assertions with legal argument, jumble analyses of adverse employment

action with discussions of causation under *McDonnell Douglas*, and generally do little to facilitate effective review of the R&R.[11] Nevertheless, reviewing the R&R under its discretion, undersigned declines to adopt the R&R in part because a reasonable jury *could* find that Byrd suffered an adverse employment action for purposes of his Title VII retaliation claim, and because the District has otherwise failed to assert a legal basis on which to grant judgment as a matter of law on that claim. Undersigned adopts the remainder of the R&R because no reasonable jury could find that Byrd suffered an adverse employment action for purposes of his discrimination and Whistleblower Act claims.

### A. A Reasonable Jury Could Find that Byrd Suffered an Adverse Employment Action for Purposes of Title VII Retaliation.

Byrd objects to the R&R's rulings that the District did not subject him to an adverse employment action,[12] and this Court accordingly reviews those rulings *de novo*. As a preliminary matter, Byrd does not dispute the legal proposition that he must prove an adverse employment action to recover under any of his causes of action. *See Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020) (per curiam) ("It has long been settled that Title VII makes discriminatory treatment actionable only if it reaches a sufficient level of substantiality.").

---

11   *See generally* ECF 66.

12   ECF 66, at 24–25.

The adverse-employment-action analysis in this case is tricky, however, because Byrd's objections implicate four distinct legal standards for what constitutes an actionable "adverse employment action." Moving from, roughly, the most lenient standard to the strictest: First, for purposes of Byrd's Title VII retaliation claim, an adverse employment action is one that "well might have dissuaded" a reasonable employee from reporting discriminatory conduct. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Second, for Title VII and § 1981 discrimination, an adverse employment action is one that causes "a *serious and material* change in the terms, conditions, or privileges of employment." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis in original). Third, for purposes of Whistleblower Act retaliation, an adverse employment action must be "analogous to or of a similar kind or class as 'discharge, suspension, or demotion.'" *Franklin v. Pitts*, 349 Ga. App. 544, 554 (2019) (quoting O.C.G.A. § 45-1-4(a)(5)). Fourth and finally, regardless of whether he meets these standards, Byrd can satisfy the adverse-employment-action requirement for all of his claims through a theory of "constructive discharge," by showing that "a reasonable person in his position would have felt compelled to resign." *Davis v. Legal Servs. Ala., Inc.*, 19 F.4th 1261, 1268 (11th Cir. 2021).

Before examining these four standards in detail, it will be useful to give more background on Byrd's employment as a District "Facilities Manager," and to

collectively present the evidence relevant to whether Byrd suffered adverse action with respect to that employment.[13] Byrd's job was, in high-level terms, to "[p]rovide administrative leadership and oversight of all activities" within his facility.[14] He was responsible, among various other duties, for "[d]irect[ing] and guid[ing] supervisors and staff within the maintenance, security, custodial, mailroom, and administrative areas."[15] To that end, Byrd directly supervised security monitors David Larkins[16] and Aaron Maharaj,[17] and head custodian Terry Oliver;[18] in addition, Byrd indirectly supervised assistant head custodian Grady Brown.[19] Part of Byrd's supervisory duties included the issuance of annual performance evaluations.[20] Byrd, in turn, was immediately supervised and evaluated by Executive Director for Administration and Policy Jorge Gomez.[21]

---

[13]   ECF 52-8, at 2.

[14]   *Id.* at 3.

[15]   *Id.*

[16]   ECF 49-9, at 2 ¶¶ 3, 5.

[17]   ECF 49-10, at 2 ¶¶ 3, 5.

[18]   ECF 49-11, at 1–2 ¶¶ 2–3.

[19]   ECF 48, at 10–11.

[20]   ECF 52-2, at 4 ¶ 8.

[21]   ECF 53, at 1 ¶ 3.

Finally, during the relevant period, the District's HR department was headed by Associate Superintendent Dr. Monica Batiste.[22]

With that context, the occurrences that Byrd asserts constituted adverse employment action against him by the District are as follows:

1. Byrd was warned by Gomez that "actions have consequences,"[23] and told that "You had better decide whose side you're on";[24]

2. Byrd was warned by Batiste that he could be issued a disciplinary Letter of Direction;[25]

3. A disciplinary Memo of Record that Byrd issued to Larkins was rescinded;[26]

4. A disciplinary Letter of Direction that Byrd caused to be issued to Brown was rescinded;[27]

5. Byrd's negative annual performance evaluations of Larkins, Maharaj, Oliver, and Brown were rescinded;[28]

6. Byrd's supervisory directive establishing communication protocols between District employees and contract workers[29] was rescinded;[30]

---

[22]   *Id.* at 2 ¶ 5.

[23]   *Id.* at 9 ¶ 36.

[24]   ECF 52-3, at 7 ¶ 21.

[25]   ECF 44, at 136.

[26]   ECF 53, at 9 ¶ 36.

[27]   ECF 52-2, at 14 ¶ 47.

[28]   *Id.*

[29]   ECF 47-8, at 1.

[30]   ECF 46-18, at 1.

7.  Byrd's supervisory directive setting Larkins's and Maharaj's work hours was rescinded;[31]

8.  A security camera that Byrd had installed, and which had been in place for two years, was removed;[32] and,

9.  Byrd was issued a disciplinary Letter of Direction by Gomez.[33]

These actions occurred over the course of two months, between July 1 and August 24, 2021. The question before the Court is whether a reasonable jury could find that the above evidence supports the conclusion that Byrd suffered an "adverse employment action" under the four legal standards in play.

The Court determines that a reasonable jury could do so, but only with respect to Byrd's Title VII retaliation claim. For that claim, what constitutes an adverse employment action is governed by the so-called *Burlington Northern* standard, under which courts ask whether the employer's actions "*well might have dissuaded* a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68 (emphasis added). As the Eleventh Circuit explained, *Burlington Northern* broadened what was actionable as retaliatory employer conduct to encompass "that which has a materially adverse effect on the plaintiff, irrespective of whether it is employment or workplace-

---

31  *Id.* at 2.

32  ECF 44, at 171–72; ECF 46-18, at 1.

33  ECF 44-24; ECF 52-2, at 14 ¶¶ 46–47.

related." *Crawford v. Carroll,* 529 F.3d 961, 973 (11th Cir. 2008). Of course, as *Carroll* indicated, the adverse action must still be *material*, as opposed to trivial; it must consist of more than the kind of "petty slights, minor annoyances, and simple lack of good manners" common to the everyday workplace. *Burlington N.*, 548 U.S. at 68. And the standard is objective: The employer's conduct is viewed from "the perspective of a reasonable person in the plaintiff's position." *Id.* at 69–70. But the Eleventh Circuit has also strongly suggested "that it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should … constitute adverse employment actions." *Crawford*, 529 F.3d at 973 n.13.

The R&R, applying *Burlington Northern*, ruled that Byrd had not suffered an adverse employment action as a matter of law.[34] Undersigned disagrees. Viewing the record in the light most favorable to the plaintiff, a reasonable jury could find that Byrd was subjected to veiled threats and targeted interference with his supervisory authority that culminated in a formal reprimand—Byrd's first in fifteen years with the District[35]—indicating that he was "demeaning, sarcastic, and intimidating," sent employees on "personal errands," failed to maintain a "professional and courteous" bearing, and evaluated his subordinates based on

---

[34]   ECF 63, at 74–78.

[35]   ECF 52-2, at 14 ¶¶ 46–47.

"retaliatory motives."[36] This letter of direction alone is likely sufficient to constitute an adverse employment action under *Crawford*, which held that an unfavorable performance review was actionable as retaliation under Title VII. 529 F.3d at 974. And while other of the District's actions are not independently actionable under Title VII, the relatively short amount of time over which the actions were taken (less than two months) gives rise to the reasonable inference that they were taken as part of a single course of disciplinary action. Collectively, the discipline Byrd received amounted to much more than the petty and trivial slights common to any workplace. A jury could find that a reasonable employee, faced with the prospect of such discipline, might well be dissuaded from reporting sex discrimination. Byrd has demonstrated a triable factual dispute as to whether he suffered an adverse employment action for purposes of his Title VII retaliation claim.

The same cannot be stated under the other legal standards. First, for purposes of his Title VII and § 1981 discrimination claims—sometimes called "disparate-treatment" claims, *Monaghan*, 955 F.3d at 860—Byrd "must show a *serious and material* change in the terms, conditions, or privileges of employment," *Town of Lake Park*, 245 F.3d at 1239 (emphasis in original). In a more recent

---

[36]   ECF 44-24, at 1.

formulation, the Eleventh Circuit has written that disparate-treatment claimants must suffer "tangible employment action[s]," defined as actions "that affect continued employment or pay—things like terminations, demotions, suspensions without pay, and pay raises or cuts—as well as other things that are similarly significant standing alone."[37] *Monaghan*, 955 F.3d at 860. The tangible employment action must be "materially adverse as viewed by a reasonable person in the circumstances." *Town of Lake Park*, 245 F.3d at 1239. Compared to a retaliation claim, the standard applied to a discrimination claim is narrower and harder to satisfy. *Monaghan*, 955 F.3d at 861.

The R&R, applying the "serious and material" standard, concluded that Byrd had not suffered an adverse employment action.[38] Undersigned agrees. Byrd cannot satisfy the narrower discrimination standard because he has not presented evidence of an adverse action taken by the District that would have a *serious and material* impact on the terms, conditions, or privileges of his employment. Certainly, the evidence suggests that one privilege of Byrd's employment was the discretionary authority to issue supervisory directives and take disciplinary action regarding his subordinates. The evidence further suggests that by repeatedly

---

[37] The Eleventh Circuit distinguishes between "disparate-treatment" and "hostile-environment" discrimination claims. *Monaghan*, 955 F.3d at 861. The Court does not construe Byrd as bringing a hostile-environment claim.

[38] ECF 63, at 52–56.

overriding Byrd's decisions and issuing Byrd a formal reprimand, the District as a practical matter undermined Byrd's discretionary authority, at least to some extent. However, on these facts, where Byrd suffered no change in job duties or responsibilities and received no directive limiting his ability to make supervisory decisions going forward, no reasonable jury could find that the diminution in Byrd's discretionary authority was a *serious and material* change in a term, condition, or privilege of his employment.

Second, Byrd has failed to create a triable factual dispute as to adverse employment action under the Georgia Whistleblower Act standard. That standard, as recently propounded by an *en banc* Georgia Court of Appeals, is whether the employer's action is "analogous to or of a similar kind or class as discharge, suspension, or demotion." *Franklin*, 349 Ga. App. at 554. *Franklin* indicated that this standard is, in application, similar to the standard for federal *discrimination* cases in the Eleventh Circuit. *Id.* at 555 (looking to "federal decisions interpreting the meaning of adverse employment action in substantive discrimination cases" for guidance and citing case law exclusively from within the Eleventh Circuit). If anything, the Whistleblower Act standard is narrower than the federal discrimination one: Section 45-1-4(a)(5), unlike Title VII, does not protect the "privileges" of employment, as distinct from its "terms" and "conditions." *Compare Franklin*, 349 Ga. App. at 554 (under the Whistleblower Act,

adverse employment action must be "analogous to or of a similar kind or class as discharge, suspension, or demotion"), *with Grimsley v. Marshalls of MA, Inc.*, 284 F. App'x 604, 608 (2008) (under Title VII, "adverse employment action need not be an ultimate employment decision, such as termination, failure to hire or demotion"). Here, where Byrd arguably suffered some negative impact to the practical exercise of his supervisory authority but remained in the same position with the same pay and benefits, no reasonable jury could find that the District's actions adversely impacted a *term* or *condition* of Byrd's employment, or were so adverse as to be analogous to a discharge, suspension, or demotion.

Third, Byrd has failed to create a triable factual dispute as to adverse employment action through a theory of constructive discharge. The Eleventh Circuit has explained that "a constructive discharge is tantamount to an actual discharge, so it constitutes an adverse employment action" for federal employment claims. *Legal Servs.*, 19 F.4th at 1267. Similarly, Georgia courts have indicated that constructive discharge can satisfy the "adverse employment action" requirement of a Whistleblower Act claim. *See Rintoul v. Tolbert*, 341 Ga. App. 688, 692 (2017). In addition, the legal standard for constructive discharge claims under 11th Circuit and Georgia law seem to be virtually identical. *See City of Pendergrass v. Rintoul*, 354 Ga. App. 618, 624 (2020) (quoting the Eleventh Circuit standard for constructive discharge in a Georgia Whistleblower Act case). Thus, a factual

14

dispute as to constructive discharge could independently create a jury question as to whether Byrd suffered an adverse employment action for *all* of his claims. However, as the R&R points out, Byrd did not at summary judgment meaningfully dispute the District's contention that the evidence did not support a finding of constructive discharge.[39] He has thereby abandoned it as a theory of liability. In any event, the standard for constructive discharge is "quite high," *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001)—Byrd must show that the District "deliberately [made his] working conditions intolerable and thereby force[d] him to quit his job," *Rintoul*, 354 Ga. App. at 624—and undersigned adopts the R&R's analysis on why Byrd does not meet that high standard.[40]

In sum, Byrd's abandonment of a constructive discharge theory, combined with his failure to adduce evidence creating a factual dispute as to the existence of an adverse employment action for purposes of his federal discrimination and Georgia Whistleblower Act claims, means that the District is entitled to summary judgment on those claims. However, because Byrd *has* demonstrated that a factual dispute exists as to adverse employment action under the more lenient standard applicable to his Title VII retaliation claim, the Court moves on to the District's

---

[39]   ECF 49, at 56–57.

[40]   ECF 63, at 59–61.

argument that it is nevertheless entitled to summary judgment on it under the *McDonnell Douglas* burden-shifting framework.

### B. A Factual Dispute Exists as to the District's Retaliatory Intent.

Byrd objects to the R&R's determination that he cannot prove the District acted with retaliatory intent.[41] To succeed in his Title VII retaliation claim, Byrd must show, not only that he suffered an adverse employment action, but that he would *not* have suffered an adverse employment action *but for* his engagement in protected activity. *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1135 (11th Cir. 2020) (en banc). This requirement—also referred to as "causation" or "intent"—is a consistent problem for plaintiffs because an employer's intent can be "elusive" and "difficult" to figure out. *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 944 (11th Cir. 2023).

Where, as here, the plaintiff seeks to prove intent through circumstantial (as opposed to direct) evidence, "one tool" that the plaintiff can use is the *McDonnell Douglas* burden-shifting framework. *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1310 (11th Cir. 2023); *see generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1993). The *McDonnell Douglas* framework has three steps. *Berry*, 84 F.4th at 1307. For a Title VII retaliation case specifically, the employee first has the burden of establishing a prima facie case of retaliation "by proving that she

---

[41]   ECF 66, at 2.

engaged in statutorily protected conduct; she suffered an adverse employment action; and a causal relation exists between the two events." *Id.* Second, the burden shifts to the employer to articulate a "legitimate, nonretaliatory reason for the adverse action." *Id.* Third, the burden shifts back to the employee to show that "the employer's proffered reason was a pretext for retaliation." *Id.*

Here, the R&R's analysis of Byrd's retaliation claim hewed to the *McDonnell Douglas* framework.[42] It determined that Byrd had not met his burden of establishing a prima facie case of retaliation because he had shown neither that he suffered an adverse employment action (as addressed above) nor a causal relation between his protected conduct[43] and the alleged adverse employment action.[44] In the alternative, the R&R determined that Byrd failed to create a factual dispute as

---

[42]  The exception is a footnote in which the R&R acknowledges that Byrd could be construed as arguing, in the alternative, "that his claims of discrimination and retaliation could survive summary judgment under the alternative analysis that there is 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker,'" ECF 63, at 85–86 n.46 (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). The R&R rejects that argument "for all the reasons discussed herein," *id.*, even though the District did not move for summary judgment on this basis. Undersigned expressly declines to adopt the R&R on this point.

[43]  The parties do not dispute that Byrd's reporting of sex discrimination was protected under Title VII. ECF 49-1, at 17.

[44]  *Id.* at 61, 83.

to pretext.[45] In either case, the R&R concluded that the District was entitled to judgment as a matter of law under *McDonnell Douglas*.

Just a few weeks before the R&R was entered, the Eleventh Circuit in *Tynes* took a deep and skeptical look at courts' continued reliance on *McDonnell Douglas* in analyzing defendants' entitlement to judgment as a matter of law under Title VII. 88 F.4th 939. *Tynes*'s unanimous panel opinion, written by Judge Grant, cast itself as a "rearticulation" of longstanding principles of Eleventh Circuit employment law, which perhaps it was in theory. *Id.* at 946. But undersigned reads *Tynes* as signaling a substantive shift in how employment cases in this Circuit should be analyzed: a shift away from *McDonnell Douglas*. And given that *McDonnell Douglas* has for decades been the sun of this district's employment law solar system, *any* shift away from *McDonnell Douglas* could profoundly change how this Court handles employment cases. Undersigned thus believes it worthwhile to discuss *Tynes* and its potential implications in some detail before attempting to applying its teachings to this case.

Judge Grant wrote in *Tynes* that the Circuit sought to dispel "widespread misunderstandings about the *limits* of *McDonnell Douglas*—the same misunderstandings that persist today." *Id.* at 946 (emphasis added). A most

---

45   *Id.* at 70–71, 85.

important limit, *Tynes* explained, is that the constituent steps of *McDonnell Douglas* do not replace the substantive elements of an employment discrimination claim. *Id.* at 941. "*McDonnell Douglas* is *not* an independent standard of liability under either Title VII or § 1981." *Id.* at 944 (emphasis in original). The standard of liability is set, not by *McDonnell Douglas*, but by the text of the statute. Thus, in *Tynes*, where the plaintiff claimed her employer violated Title VII's prohibition on discrimination in employment "because of" race and sex, the dispositive issue was simply "whether the defendant intentionally discriminated against the plaintiff."

If Judge Grant's opinion sought a tweak to the *McDonnell Douglas* rules, however, Judge Newsom's concurrence seemed to prefer that we stop playing the *McDonnell Douglas* game altogether. In his view, "*McDonnell Douglas* … not only lacks any real footing in the text of Rule 56 but, worse, actually obscures the answer to the only question that matters at summary judgment." *Id.* at 949 (Newsom, J., concurring). *McDonnell Douglas*'s flaws, as the concurrence saw it, were many. It feels "awfully made up," an artifact of a past era of freewheeling judicial lawmaking. *Id.* at 951. It forces courts to jump through legal hoops "that only peripherally relate" to the dispositive contest. *Id.* It fractures what should be "a holistic evidentiary question" and tries to jam the resulting pieces into "distinct doctrinal pigeonholes." *Id.* at 952–53. And, significantly, its "increasingly rigid application" was causing courts "to get cases *wrong* — in particular, to reject cases

at summary judgment that should, under a straightforward application of Rule 56, probably proceed to trial." *Id.* at 955 (emphasis in original).

Both the majority and the concurrence reserved much of their ire for the first step of *McDonnell Douglas*, the prima facie case, as a source of "continuing confusion." *Id.* at 945 (majority opinion). Despite repeated instructions to the contrary, *Tynes* noted that parties and courts were continuing to treat the plaintiff's establishment of a prima facie case as a requirement to survive summary judgment—a "far cry" from what *McDonnell Douglas* intended. *Id.* As *Tynes* explained, a plaintiff's ability to establish a prima facie case cannot be dispositive of whether the defendant is entitled to judgment, because "the components of a prima facie case are not necessarily coextensive with the evidence needed to prove an employment discrimination claim." *Id.* at 946. Thus, a plaintiff "will always survive summary judgment," *id.* (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)), even if he cannot make out a prima facie case, if he "presents enough circumstantial evidence to raise a reasonable inference of intentional discrimination," *id.* at 947. Whether a plaintiff established his prima facie case and whether the defendant is entitled to judgment as a matter of law are legally distinct inquiries; so distinct that, in *Tynes*, a defendant who "focused exclusively" on the plaintiff's prima facie case and failed to contend "that the

evidence, taken as a whole, could not support the jury's verdict … forfeited any challenge to the ultimate finding of discrimination." *Id.*

Unfortunately, *Tynes* did not explain how these seemingly fundamental *McDonnell Douglas* principles—that it is not an "independent standard of liability," *id.* at 944; that courts using it must always "look beyond the prima facie case to consider all relevant evidence in the record to decide the ultimate question of intentional discrimination," *id.* at 947—relate to the framework's third step.[46] Nor is this an academic issue: if courts are to stop granting summary judgment at step one, for plaintiffs' failure to prove their prima facie case, then essentially *all* grants of summary judgment under *McDonnell Douglas* will come at step three, for plaintiffs' failure to show pretext. It thus behooves courts to inquire into pretext as precisely as possible, in a way that "turns on the substantive claims and evidence in the case, not the evidentiary framework." *Id.* at 947.

This Court's attempt to do so begins with *McDonnell Douglas* itself. *McDonnell Douglas* was a Title VII suit by a black mechanic against his former employer for failure to rehire. The mechanic was initially discharged "in the course

---

[46] The second step, the defendant's rebuttal, is thankfully straightforward. If the defendant cannot "introduce evidence of a nondiscriminatory reason," then the plaintiff is entitled to judgment. *Tynes*, 88 F.4th at 945. Few cases, if any, turn on the sufficiency of the defendant's rebuttal evidence, in part because the defendant's burden of production in rebuttal is "exceedingly light." *Perryman v. Jonson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983).

of a general reduction in [the employer]'s work force." *McDonnell Douglas*, 411 U.S. at 793. To protest his discharge, which the mechanic believed was part of a larger trend of racially discriminatory hiring practices, the mechanic participated in an "illegal demonstration," *id.* at 797—a "stall-in" in which protestors "stalled their cars on the main roads leading to [the employer]'s plant for the purpose of blocking access to it at the time of the morning shift change," *id.* at 794—for which the mechanic was arrested and fined, *id.* at 795. Three weeks later, the mechanic applied for a job with his old employer in response to a public advertisement. *Id.* at 796. The employer denied him, citing his involvement in the stall-in. *Id.* The mechanic sued, asserting that he had been denied employment "because of his race and color" in violation of Title VII. *Id.* at 801.

It was in this factual context that the Supreme Court laid out an "order and allocation of proof," *id.* at 800, that would advance Title VII's mandate to ensure "fair and racially neutral employment and personnel decisions," *id.* at 801, without requiring employers to hire a person "simply because … he is a member of a minority group," *id.* at 800. The Supreme Court accordingly explained how a plaintiff is to make out his prima facie case, noting that the mechanic had done so by establishing that he was a viable candidate for the position the employer was advertising. *Id.* at 802. The Supreme Court then explained how the prima facie case could be rebutted, noting that the employer had met its burden by establishing

that the mechanic had "engage[d] in [a] deliberate, unlawful activity against it." *Id.* at 803.

But, the Supreme Court continued, "the inquiry must not end [t]here." *Id.* at 804. For while Title VII does not require the employer to "rehire one who was engaged in unlawful, disruptive acts against it," neither does Title VII permit the employer "to use [such] conduct as a pretext for [prohibited] discrimination." *Id.* Thus, after the employer rebuts the plaintiff's prima facie case by articulating a nondiscriminatory reason for adverse action, the plaintiff should "be afforded a fair opportunity to show that [the employer's] stated reason … was in fact pretext." *Id.* In *McDonnell Douglas*, that meant a new trial. *Id.* at 805. And an employer's reason is pretext, the Supreme Court subsequently reemphasized, if it is "pretext *for discrimination*," meaning that a plaintiff seeking to prove pretext must convince the factfinder both that the employer's proffered reason is false *and* that the real reason for the employer's actions was discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original). Thus, if a plaintiff has shown that an employer's reason was pretextual, then it necessarily follows that he has also shown that he was discriminated against. In other words—belaboring the point only because it is an important one—saying "the employer's reason is pretext" and saying "the employer discriminated against the plaintiff" are legally equivalent for purposes of the employer's Title VII liability.

Or, they are legally equivalent in theory. A look through past opinions in this district quickly reveals they are not always equivalent in practice. Often, what has purportedly been an inquiry into whether the employer's justification was *pretextual* looks, in hindsight, much more like an inquiry into whether the employer's justification was *legitimate*. The question courts should be asking under *McDonnell Douglas's* pretext prong is, "*Did* the employer *actually* act for an *illegal* reason?" But the question courts often seem to be answering is, "*Could* the employer have *legitimately* acted for a *legal* reason?" These are related but distinct inquiries. They are related, in that the existence of a "presumptively valid reason" for action might strongly suggest an absence of discrimination. *McDonnell Douglas*, 411 U.S. at 805. But they are distinct in that moving from "this is *a legitimate* reason" to "this was *the actual* reason" requires an inference of fact, and courts should only make it at summary judgment if the entirety of the record, viewed in the light most favorable to the plaintiff, could not support the opposite inference that the employer's presumptively valid reasons "were in fact a coverup for a racially discriminatory decision." *Id.*

This is wholly consistent with *Tynes*'s instruction that courts, "when using the *McDonnell Douglas* framework," should grant judgment as a matter of law only after "look[ing] beyond the prima facie case to consider *all relevant evidence in the record* to decide the ultimate question of intentional discrimination." *Tynes*, 88

F.4th at 947 (emphasis added). It is also wholly consistent with the Supreme Court's approach in *McDonnell Douglas* itself, in which the existence of a legitimate reason to reject the mechanic's job application—his admitted engagement in illegal activity targeting the employer—did not preclude the existence of a factual dispute as to the employer's discriminatory intent.

No wonder, then, that when the Supreme Court has discussed pretext, it has done so not in the context of summary judgment but of trial. *See Tynes*, 88 F.4th at 952 ("[S]o far as I can tell, the Supreme Court has specifically addressed *McDonnell Douglas*'s application to Title VII cases at summary judgment only once, and in that decision held that it didn't apply.") (Newsom, J., concurring). As Justice Powell wrote in *Texas Department of Community Affairs v. Burdine*: The "evidence and inferences properly drawn [from the plaintiff's prima facie case] may be considered *by the trier of fact* on the issue of whether the defendant's explanation is pretextual." 450 U.S. 248, 255 n.10 (1981). And as Justice Rehnquist wrote in *U.S. Postal Service Board of Governors v. Aikens*: After rebuttal of the prima facie case, "the *fact finder* must then decide whether the rejection was discriminatory within the meaning of Title VII." 460 U.S. 711, 715 (1983). And as Justice Scalia wrote in *Hicks*: The "elements of the prima facie case" alone, combined with the "*factfinder's disbelief* of the reasons put forward by the defendant," are sufficient to support a jury verdict in the plaintiff's favor. *Hicks*, 509 U.S. at 511. And as Justice O'Connor

wrote in *Reeves v. Sanderson Plumbing Products, Inc.*: The factfinder's determination as to pretext will stand unless "the record *conclusively* reveal[s] some other, nondiscriminatory reason for the employer's decision, or if the plaintiff create[s] only a weak issue of fact as to whether the employer's reason [is] untrue and there [is] *abundant and uncontroverted independent evidence* that no discrimination ha[s] occurred. 530 U.S. 133, 148 (2000) (emphasis added). In other words, pretext, like any other fact question under Rule 56, goes to the jury unless it can only be answered one way.

The same conclusion can be reached by beginning with the Eleventh Circuit's now-familiar requirement that, to survive summary judgment, a plaintiff "establish a genuine dispute of material fact that the employer's reason is pretextual." *Berry*, 84 F.4th at 1308. This requirement effectively turns pretext into an element of a Title VII claim. That is no problem if "pretext" and "discrimination" are legally equivalent: if "dispute of fact as to pretext" means "dispute of fact as to whether the employer discriminated against the plaintiff." But it becomes a problem if, in application, "dispute of fact as to pretext" comes to mean anything else, and a bigger problem the further the "pretext" and "discrimination" inquiries drift apart.

Take, for example, the case in which the so-called pretext requirement morphs into a demand that the plaintiff create a factual dispute as to the existence

of a legitimate, alternative basis for the employer's adverse action. In that case, the plaintiff must establish two elements—(1) the employer *could not have acted* for a legal reason, and (2) the employer *in fact acted* with discriminatory intent—when Title VII only requires the second. So does an evidentiary step of the *McDonnell Douglas* framework turn into a substantive requirement of Title VII, which *Tynes* forbids. Parties and courts can avoid that mistake if, in arguing and deciding the dispositive issue under *McDonnell Douglas*—pretext—they do so in a way that embraces the dispositive issue under Title VII and the Federal Rules: Could a reasonable jury could find, viewing the entire record in the light most favorable to the plaintiff, that he was a victim of intentional discrimination?

*Tynes*, in fact, suggests the Court go further. In *Tynes*, when the employer argued that it was entitled to judgment as a matter of law for the sole reason that the plaintiff failed to satisfy *McDonnell Douglas*, its motion was denied as failing to explain why judgment would be proper under Title VII. Applying that principle to the pretext context: When a defendant moves for judgment as a matter of law on the grounds that the plaintiff has failed to show pretext, but it focuses exclusively on the *legitimacy* of its proffered justification in reliance on *McDonnell Douglas* and does not contend that no reasonable jury could find that it discriminated against the plaintiff in violation of Title VII, then it will have

forfeited its entitlement to judgment as a matter of law and its motion should be denied.

Refocusing the analysis in this way, "away from *McDonnell Douglas*'s judge-made formulation and toward Rule 56's plain language" likely will, as Judge Newsom's *Tynes* concurrence pointed out, result in more denials of employers' motions for summary judgment. *Id.* at 955, 957 (Newsom, J., concurring). And perhaps that means more trials, creating more work for "already busy district courts." *Id.* at 955. But the job of the district court is not only to pursue judicial efficiency but also to "strive to get the cases right according to the governing law." *Id.* at 955. This Court will continue to do so, to the best of its evolving understanding of what Title VII and Rule 56 require.

With that, the Court returns to the R&R causation analysis. The R&R granted summary judgment to the District because it determined that Byrd had failed to establish causation under *McDonnell Douglas*, both for purposes of his prima facie case and as a question of pretext. As to the prima facie case, the R&R determined that Byrd had failed to demonstrate a causal connection between his protected activity and the District's alleged adverse action because he had reported sex discrimination *after* the District had already launched an internal

investigation into him.[47] The R&R reasoned that "the mere fact that the investigation was not concluded … until after [Byrd] engaged in protected activity is simply not probative of retaliatory intent in this case."[48] In so reasoning, the R&R relied on *Clark County School District v. Breeden*, in which the Supreme Court explained that the employer's implementing of an adverse action, where the action was "previously contemplated, though not yet definitively determined" at the time the plaintiff engaged in protected activity, is "no evidence whatever of causality." 532 U.S. 268, 272 (2001). But here, the District has presented no evidence whatever that its adverse actions were *previously contemplated* at the time Byrd engaged in protected conduct. Thus, *Breeden* is simply not applicable to the retaliatory intent analysis in this case.

Rather, the evidence supports the conclusion that "the protected activity and the adverse action were not wholly unrelated." *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999). As the R&R points out, Byrd can satisfy the "not wholly unrelated" requirement if he shows "that the decision maker was

---

[47] The R&R states that Byrd failed to respond to the District's causation argument. ECF 63, at 80. This is incorrect. *See* ECF 52, at 8. ("The facts in this case establish a nexus between the Plaintiff's protected activity and the adverse actions taken against him."). And to the extent that Byrd's *response* does not explicitly address the timing of the District's investigations, that can be explained by the fact that the District first explicitly raised the timing argument in its *reply*. ECF 56, at 8–9.

[48] ECF 63, at 81.

aware of the protected conduct at the time of the adverse employment action."[49] Here, Byrd engaged in protected conduct by reporting sex discrimination to Gomez and Batiste on June 25,[50] and his allegedly adverse treatment at their hands began on July 1. That is sufficient for purposes of Byrd's prima facie case.

In any event, summary judgment should not be granted in this case for Byrd's failure to establish his prima facie case now, *after* its evidentiary role under *McDonnell Douglas* has already played out. As *Tynes* explained, the point of the *prima face* case is that it "forces the defendant to come forward with evidence explaining its actions." 88 F.4th at 945. Here, the District has done so: It has come forward with evidence that Byrd suffered adverse treatment, not because he reported sex discrimination, but because an internal investigation found that he had treated his subordinates unfairly.[51] And once the prima facie case has fulfilled its function, "it no longer has any work to do." *Id.* Thus, where the District "has done everything that would be required" to respond to Byrd's prima facie case, whether Byrd actually established one "is *no longer relevant.*" *Id.* (emphasis in original). Under *McDonnell Douglas*, once the defendant rebuts at step two, the

---

[49]   ECF 63, at 79 (quoting *Brungart v. Bellsouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000)).

[50]   ECF 47, at 141.

[51]   ECF 49-1, at 17; ECF 56, at 9–10.

Court does not go back to step one to relitigate the prima facie case. Instead, it moves on to step three, having "all the evidence it needs to decide" the ultimate issue: "whether the defendant intentionally [retaliated] against the plaintiff." *Id.*

This brings the Court to pretext. The R&R, analyzing the evidence under *McDonell Douglas*, determined that Byrd could not show pretext for purposes of his *sex retaliation* claim "for the same reasons" that he could not show pretext for his *race and color discrimination* claims.[52] That determination, while firmly in line with the practice in this district, will not be adopted here. The R&R is in line with practice because it treats the inquiry into "pretext" as an inquiry into the *legitimacy* of the District's proffered justification for its actions: It is perfectly sensible that a justification that is *legitimate* for purposes of race and color discrimination would also be *legitimate* for purposes of sex retaliation. But the question at the pretext step is not whether the District's proffered justification is legitimate, but whether Byrd has presented evidence from which a reasonable jury could conclude that the District's legitimate justification is nevertheless *false*, and that the real reason he suffered adverse action is retaliation. In other words, the question is not whether a reasonable jury could believe the District's explanation in a vacuum; the question is, if asked to choose between the District's explanation and Byrd's, whether a

---

[52]   ECF 63, at 84.

reasonable jury could believe Byrd's just a little bit more. And the strength of Byrd's sex retaliation claim cannot logically be inferred from the strength of his race and color discrimination claims. They rely on different evidence and require independent analyses.

Moving finally to that analysis: the following is the entirety of the District's causation argument before Judge Vineyard that it was entitled to summary judgment on Byrd's Title VII retaliation claim:

> Plaintiff has no evidence that his alleged "complaint" on behalf of another individual was the cause of the receipt of this letter of direction. … Put simply, Plaintiff's claim relies on his contention that it was only his raising a complaint of "sexual harassment" by a contracted employee which was the but-for cause of his receipt of the letter of direction. However, this contention overlooks the following undisputed facts: 1) there were four (4) separate complaints raised by his subordinate employees, all of which occurred prior to the alleged sexual harassment allegation; 2) an internal investigation was conducted beginning June 11, 2021 and concluding in August of 2021; 3) the internal investigation resulted in findings of unfair treatment and/or retaliation for actions which Plaintiff does not dispute he took; and 4) Plaintiff's letter of direction was directly related to the findings of the internal investigation and included, as Plaintiff admitted, "reasonable employer directives."[53]

This argument in turn boils down to two contentions: that Byrd (1) has "no evidence" of causation, and (2) does not dispute that he was issued a letter of

---

[53]   ECF 49-1, at 17–18.

direction pursuant to an internal investigation triggered by his subordinates' complaints. (The District reasserted the same two contentions in its reply.[54]) But the first is flatly wrong, and the second does not entitle the District to judgment as a matter of law.

First, the District asserts that the record shows no evidence of causation. What the record actually shows is the following:

1. That, less than a week after June 25—the day Byrd reported allegations that his indirect subordinate Brown was sexually harassing a contract janitorial worker named L.M.[55]—the District began taking adverse action against Byrd for the first time in his 15-year career.

2. That, beginning around the time of Byrd's reporting, and concurrent with Byrd's pressuring his superiors to respond to L.M.'s allegations, HR Director Batiste's and Byrd's supervisor Gomez's attitude towards Byrd became increasingly hostile.[56]

3. That, on July 1, Gomez rescinded Byrd's performance evaluation of his subordinate Larkins,[57] in response to a complaint Larkins filed on June 11,[58] in apparent violation of a District policy that "[j]ob performance evaluations [are not] subject to complaint."[59]

---

[54]   ECF 56, at 8–10.

[55]   ECF 47-3, at 6–7. The record indicates that the janitorial contractor subsequently sought to terminate its relationship with the District based on the District's inability to prevent "inappropriate and/or harassing and retaliatory behaviors" against L.M. ECF 47-18, at 1.

[56]   ECF 52-2, at 28; ECF 44, at 170–71.

[57]   ECF 52-2, at 9 ¶ 28a.

[58]   ECF 49-9, at 4 ¶ 11.

[59]   ECF 44-5, at 2. The R&R notes that an exception exists for complaints "based on unlawful discrimination." ECF 63, at 67 (quoting ECF 47-1, at 24). That

4. That, on the same day, in response to the same June 11 complaint, Gomez rescinded a memo of record that Byrd had issued to Larkins on March 16, in apparent violation of a District policy that there be no more than "ten (10) calendar days between the most recent alleged act about which a complaint may be filed and the first written notice of complaint is received."[60]

5. That, in a conversation between Byrd and Batiste about L.M., Byrd was warned his conduct could earn him a letter of direction.[61]

6. That, in a conversation between Byrd and Gomez in which Byrd condemned the District's response to L.M.'s allegations, Gomez told Byrd, "You had better decide whose side you're on."[62]

7. That, in an August 4 meeting between Byrd and Gomez, Gomez rescinded three of Byrd's supervisory directives,[63] reversing a protocol that minimized direct contact between Brown and L.M.,[64] and removed a security camera that Byrd had installed two years prior for the purpose of monitoring Brown.[65]

8. That, in his August 24 letter of direction to Byrd, Gomez rescinded a performance evaluation that Byrd had caused to be issued to Brown, and also rescinded Byrd's performance evaluations of his subordinates Oliver and Maharaj,[66] again in apparent violation of District policy.

---

exception is irrelevant here, where no party has argued that Byrd's treatment of his subordinates was *unlawful*.

[60] ECF 44-5, at 2.

[61] ECF 44, at 136.

[62] ECF 52-3, at 7 ¶ 21.

[63] ECF 46-18, at 1.

[64] ECF 47-8, at 1.

[65] ECF 44, at 172.

[66] ECF 44-24, at 1; ECF 52-2, at 14 ¶ 47.

9. And that, in the same letter of direction, Gomez rescinded a letter of direction that Byrd had issued to Brown,[67] despite later testifying under oath that Byrd's letter to Brown was an appropriate sanction.[68]

This evidence, viewed in the light most favorable to Byrd, amounts to more than "no evidence" of causation.

Second, the District asserts that Byrd cannot show pretext because his letter of direction was issued pursuant to an internal investigation, launched in response to employee complaints. But—leaving aside both the factual dispute over the propriety of the District's internal investigation[69] and the various adverse actions that Byrd alleges he suffered in addition to the letter of direction—the undisputed evidence about the District's internal investigation suffices, at most, to show the potential *legitimacy* of the District's proffered justification. It shows that the District *might* have issued Byrd a letter of direction for a non-retaliatory reason. But it does not necessarily eliminate any genuine dispute as to whether the District *actually* did. To be entitled to judgment as a matter of law under Title VII and Rule 56, the District must assert the absence of a genuine dispute of fact as to its retaliatory intent. Because the District did not do so, it is not entitled to judgment as a matter

---

[67] *Id.*

[68] ECF 46, at 98.

[69] *Supra*, note 59–60.

of law on Byrd's Title VII retaliation claim, and its motion for summary judgment as to that claim is denied.

## IV.    CONCLUSION

The R&R [ECF 63] is **ADOPTED IN PART** and **DECLINED IN PART**. The District's motion for summary judgment [ECF 49] is **DENIED** as to Byrd's Title VII retaliation claim, and **GRANTED** as to his remaining claims. The parties are **ORDERED** to file a joint Proposed Pretrial Order consistent with this Order within 30 days.

**SO ORDERED** this 31st day of March, 2024.

Steven D. Grimberg
United States District Judge